[Civ. No. 14068. Second Dist., Div. One. Jan. 19, 1944.]

Estate of MARTHA DEAN, Deceased. FRANCES LINDSAY et al., Respondents, v. DR. LLOYD E. DEAN, Appellant.

Sherman & Sherman and Glenn M. Still for Appellant.

Lane & Lane for Respondents.

DORAN, J.—This is an appeal by contestant from a decree admitting an alleged lost or destroyed will to probate.

Martha Metzger Dean died on or about January 30, 1942. A will dated January 27, 1942 was admitted to probate. Virginia Lindsay, deceased's sister, and Dr. Lloyd E. Dean, deceased's husband, qualified as executors. July 8, 1942, Frances Lindsay, daughter of Virginia Lindsay, filed a petition for the probate of an alleged lost or destroyed will and codicil thereto. A contest and objection was filed by Dr. Lloyd E. Dean. The issues raised by the answers to the contest and objections were duly tried and the court found as follows.

"I.

"The Court finds that the said Martha Metzger Dean did on or about the 6th day of October, 1932, make and execute her Last Will and Testament, a copy of which is on file in this proceeding and is made a part of Proponent's Petition for Probate marked 'Exhibit A'; that at the time said Will was executed the said Martha Metzger Dean was over the age of eighteen years, and was of sound and disposing mind, and was not acting under menace, duress, fraud or undue influence; that said will was in writing signed by the Testatrix, and attested by two subscribing witnesses who signed at the request of testatrix, and in her presence and in the presence of each other after she declared the same to be her last will and testament;

"II.

"That decedent kept the original of her said will of October 6, 1932, in her safe deposit box in the Bank of America, Glendale Branch; that for more than ten years prior to the death of decedent Virginia H. Lindsay, sister of decedent, who resided in Burt, New York, was the record holder of said safe deposit box as a joint tenant with decedent, but that at no time did she have personal access thereto; that

Eleven (11) days prior to the death of decedent, to-wit, on January 19, 1942, while decedent was in the hospital, she permitted her husband, contestant herein, Lloyd E. Dean, to have access to said safe deposit box; that on or about January 20, 1942, said Lloyd E. Dean transferred said safe deposit box and the contents thereof to his own name exclusively; that on four or more occasions between the 19th day of January, 1942, and the date of death of decedent, January 30, 1942, and on numerous occasions thereafter, Contestant, Lloyd E. Dean, entered the said safe deposit box; that the last entry of decedent in said safe deposit box was on January 13, 1942, before she went to the hospital; that decedent thereafter had no access to said safe deposit box;

## "III.

"That on two or more occasions between the 20th day of January, 1942, and the date of death of decedent on January 30, 1942, decedent stated she had a will and that the same was in her safe deposit box in the Bank of America; that between January 20, 1942, and January 30, 1942, decedent had in her possession a copy of said Last Will and Testament of October 6, 1932, and referred to the same as a copy of her will, and stated she wanted to make some changes therein;

## "IV.

"The Court further finds that at the death of decedent on January 30, 1942, the said Will of October 6, 1942 [sic], was in existence, and that the same had not been revoked or cancelled; that said original Will of October 6, 1932, was lost, or fraudulently destroyed by contestant, Lloyd E. Dean, sometime subsequent to the death of decedent; that after decedent's death demand was made on contestant, Lloyd E. Dean, to produce said original will of October 6, 1932, but that he failed and refused to produce the same;

## "V.

"That the provisions of said original Will of October 6, 1932 were clearly and distinctly proven by two creditable witnesses, to-wit, C. H. Hasbrouck, an attorney at law, who drew said will, Helen Burland, the typist who wrote the said original and duplicate carbon copy of said will;

## "VI.

"That at the date of death of decedent she left a codicil

to aforesaid Will of October 6, 1932, dated the 3rd day of July, 1941, which codicil is wholly written, dated and signed in the handwriting of deceased; that the said codicil was in existence at the date of death of decedent, and has heretofore been filed with the Clerk of this Court;

## "VII.

"That at the date of death of decedent she left a Will dated the 27th day of January, 1942, which was heretofore admitted to probate on March 13, 1942, and Letters Testamentary thereon were issued to Virginia H. Lindsay and Lloyd E. Dean;

## "VIII.

"The Court further finds that all of the allegations of Proponent's Petition for Probate on file herein are true; that all of the allegations contained in Contestant's First, Second and Third Affirmative grounds of contest and Objections are untrue."

The findings correspond substantially to the allegations of the petition.

Appellant submits under the heading "Preliminary Statement" that, "This appeal raises the question of the sufficiency in law and fact of the evidence upon which the decree was based admitting said alleged will to probate and also questions relating to the insufficiency of the pleadings and the evidence." Under the heading "Argument Upon the Issues Upon this Appeal," appellant divides the argument into four "issues." Without reciting them, it is sufficient to note that they together present but two questions, viz.: 1. Does the evidence sustain the findings? 2. Do the findings support the judgment? And there is no other question presented by the appeal.

In that connection, it should be emphasized at the outset that the court found the will in question to be in existence at the time of the testator's death and that the same had not been revoked or cancelled. The record reveals that decedent evidently had in mind, during the last few days preceding her death, making some changes in her will. During that time she had in her possession a carbon copy of said will which by interlineation and deletion warranted a conclusion by the trial court that, although a few changes in bequests of comparatively minor importance were contemplated, nevertheless, such changes indicated no intention to change the

general scheme of distribution. Moreover, the fact remains, which the court was bound to accept, that no such changes were effected in another will and only the valid will could be considered for the purpose of carrying out the testator's intention.

The testimony of Dr. Dean raised a conflict in the evidence but, that there is sufficient evidence to support the findings, there can be no question. Briefly, it is as follows. The deceased declared several times before her death that her will was in the bank, in the safety deposit box; that the Bank of America had her will. Evidence of this declaration is to be found in the testimony of several witnesses. In connection with the copy of the will hereinbefore mentioned, decedent referred to it as the copy of her will. Decedent asked her husband, Dr. Dean, several times before her death to have a lawyer come to her room for the purpose of making some changes in her will. In part, Dr. Dean's testimony in that regard is as follows.

"Q. . . . When did you first learn that the Bank of America was designated as the executor in the 1932 document? A. I think it was—— Well, it was sometime up there while Mrs. Dean was ill at the sanitarium. I can't say just what time or when it was precisely. Q. Didn't you have some discussion with Mr. Kihorny about that? A. Yes, when she wanted to have a new will made out. Q. When did you have this talk with Mr. Kihorny in which he—— A. It must have been about the 26th or 27th of January, 1942. Q. And how did Mr. Kihorny know that the Bank of America was executor? A. I think he said Martha told him. Q. And he informed you? A. Well, I don't recall that. Q. Well, when was the first knowledge you had, who informed you? A. It was right around there, I think. Martha stated herself the Bank of America was executor. Q. You had a talk with Martha with reference to this will? A. Not specifically. Q. What did she say? A. She spoke incidentally. Q. When did she so speak? A. Well, in the few days preceding the making of this will on January 27th, was when she was wanting to make a will. She wanted to make out an entirely new will. Q. Just what did she say to you, doctor? A. She said she would like to have an attorney up when she got strong enough some day to have a new will made. Q. Was that all she said? A. I think so. It is about all I recall aside from

some indirect statement that the Bank of America was made executor by the terms of the old will. Q. Did she call it 'the old will?' A. No, she called it 'her will.' Q. She told you that a few days before the 27th of January, 1942? A. Yes, right around in there. Q. And she intended to have a lawyer come and make some changes? A. Yes, she wanted him to call when she was stronger. Q. Did she ever have a lawyer up? A. She never got strong enough to. Q. Isn't it a fact doctor, she did ask you to have an attorney come and you said the attorney was out of town and you couldn't get him? A. I don't recall that. Q. Do you recall there was at least three different times when the question of having an attorney come up was discussed in your presence? A. I suppose there were as many as that. Q. What was your response? A. My response was I would get him as soon as she was able. Q. She wanted him too? A. As soon as she was able. Q. Didn't she ask to have him come? A. When she was able. She never told me she was able. Whenever it was mentioned she said, 'Wait, maybe I will be stronger tomorrow.' Q. She never made the statement she was not able until the evening of the 28th of January, when she was reading the copy of the will and she said to, 'Take it away and see if I am stronger in the morning?' A. That is what she said. She said, 'Perhaps I will be stronger in the morning and we can have the attorney come over and make a new will.' Q. Had she asked you before? A. She intimated she wanted to have an attorney come as soon as she could. Q. Didn't she ask you why you didn't have the attorney come? A. No, because that was her own doing. She was the one that was preventing the attorney coming. I was willing and wanted to have him come."

The evidence further reveals that on January 27th Dr. Dean himself prepared a will for decedent which, he testified, was done at her request. It is as follows.

"Glendale Sanitarium
Glendale, Calif.
January 27, 1942

"To Whom It May Concern:

"This is to certify that I, Mrs. Martha Dean, being in my right mind and in possession of my mental faculties, do wish, appoint and ordain my husband—Dr. Lloyd E. Dean, and my sister—Mrs. Virginia Lindsay, to administer all my affairs from now on, and in accordance with their combined

best and honest judgment and in accordance with my directions and their knowledge of my wishes as already expressed or as may yet be expressed, to distribute all my remaining worldly goods.

"They will thus constitute my agent and the executors of my estate without bond.

"This is my last will and testament.

"Signed—MRS. MARTHA DEAN

"WITNESSES—
JOSEPH I. KIHORNY
PAULINE PLAMONDON
AGNES A. DRAKE
MARION E. LANE, R.N.''

It is noteworthy, which the trial court in all probability regarded as a material circumstance, that the difference in the two wills redounded to the benefit of Dr. Dean materially. By the original will of 1932 Dr. Dean received only his office furniture and equipment. The estate which consisted of a residence and stocks and bonds was appraised at $15,275.89. There was evidence also that Dr. Dean had years before executed a promissory note in the sum of $6,050 in favor of his wife. Dr. Dean testified with regard to this note as follows:

"Q. By MR. A. W. LANE: What became of the note? A. I destroyed it at her order. Q. When? A. I think about January 27th. Q. Where did you find the note? A. In the safety box that she had turned over to me. Q. You may state under what circumstances you procured the note from her safety deposit box. MR. CHASE: Now—— well, I withdraw it. A. Why in looking over the things in the safety deposit box I noticed this note and subsequently when I was up to her room I mentioned it to her. I said, 'Martha, I see you have that note there of $5,800 or $6,000.' I said, 'What do you want done with that?' She said, 'Destroy it,' just two words. Q. By MR. A. W. LANE: Was anyone present? A. I don't recall. Q. Isn't a fact, doctor, she asked you to go down to the safety deposit box and get some papers and jewelry and bring up to the hospital room? A. That is right, some jewelry. Q. Did you get anything else? A. I don't recall I did. Q. Didn't you bring up this note on which her sister was one of the signers? A. I don't think I did at that same time. Q. You did bring it up at her request? A. Yes, after I had asked her. I said, 'I suppose you would want Virginia to

have the $800.00 note?' Q. Did you say that before or after you had destroyed the $6000 note? A. I think it was before; I couldn't say definitely. Q. What did she say about that note, you say $800 note? A. She said yes, she would like to have Virginia have it. Q. And what did she do? A. She didn't do anything until I got the note. I went and got the note from the safety deposit box and brought it up to her and wrote on the back of it transferring it to Virginia, and she signed it and handed it over to Virginia. Q. Virginia was on the note, you affixed the assignment to Virginia and Mrs. Dean signed it and handed to Virginia? A. That is right. Q. Did she do that with your $6000 note? A. No. Q. She didn't put her name on the $6000 note you had signed? A. No, she told me to destroy it.''

The evidence justified the inference that the married life of Dr. Dean and decedent over a period of years had not been altogether peaceful and congenial. Evidence of such a circumstance was material and manifestly taken into account. In that connection Dr. Dean himself testified on cross-examination: ''Martha and I were very different temperaments, I will say. Her being dead and gone I didn't like to bring these things up at all, but it is true that we had many differences, but at the time of her death we were agreed. We had asked each other's forgiveness for any past differences or unpleasantnesses and I was glad that she could pass away under those conditions.''

There was evidence also that the deceased's safe deposit box at the bank had always been in her name. Dr. Dean at no time had access thereto until about ten days before the death of deceased. The circumstances surrounding Dr. Dean's visit to the safety deposit box and the ultimate transfer thereof from Mrs. Dean to Dr. Dean justified the inference on the part of the trial court that Dr. Dean's interest in the box and its contents was not unselfish.

The foregoing account of the evidence includes what may be regarded as the most important phases of the trial. The fact of the due and lawful execution of the alleged lost or destroyed will and its provisions is not disputed. It is clear from the record that the only disputed question presented for the trial court's determination was whether said will was in existence at the time of the testator's death. This the court determined was the fact and the duty to admit such

will to probate followed. As a matter of law, the pleadings were adequate, the evidence supports the findings and the findings support the judgment. Appellant's argument with regard to presumptions are not applicable. See *Estate of Bristol*, 23 Cal.2d 221 [143 P.2d 689], and the dissenting opinion of Mr. Justice Traynor therein as well.

For the foregoing reasons the judgment is affirmed.

York, P. J., and White, J., concurred.