[Civ. No. 16261. Second Dist., Div. Three. June 22, 1948.]

Estate of ANTONIO MORAMARCO, Deceased. TERESA MORAMARCO et al., Appellants, v. J. MORAMARCO et al., Respondents.

Louis Ferrari and J. V. McDermott for Appellants.

Earl Malmrose for Respondents.

SHINN, Acting P. J.—This is an appeal by nieces and nephews of Antonio Moramarco, deceased, namely, children of his deceased brother, Frank, from a judgment denying their petition for revocation of a document which the court had previously admitted to probate, upon findings that it was the will of decedent which had been duly executed by him, was in existence at the time of his death but had been lost or unintentionally destroyed.

The grounds of the amended petition for revocation were that the will, if executed by decedent, had been destroyed by him with the intention of revoking it, and that the proof

offered and considered by the court and upon which the will was admitted to probate was insufficient to comply with the requirements of law for proof of a lost or destroyed will. Joe Moramarco, brother of decedent, and nephews and nieces, children of Nick Moramarco, deceased, brother of Antonio, answered the amended petition, denying the allegations thereof and asserting as a separate defense that the terms of the will and the due execution thereof had been clearly proven on the petition for probate, that the time for appeal from the order admitting it had expired, and that the order had become final. The findings were sufficient to support a judgment admitting the document to probate as a lost will.

The contention of the appellants is that only one of the witnesses produced by respondents purported to know the contents of the alleged lost will, whereas section 350 of the Probate Code states, "[n]o will shall be proven as a lost or destroyed will unless proved to have been in existence at the time of the death of the testator, or shown to have been destroyed fraudulently or by public calamity in the lifetime of the testator without his knowledge; nor unless its provisions are clearly or distinctly proved by at least two credible witnesses." Other provisions of the section are not pertinent to the case. In its essential provisions the will read: "after all my lawful debts and funeral expenses are paid and satisfied I give and bequeath to my brothers, Joe and Nick, all that I have to be divided by them equally share and share alike"; it appointed Joe Moramarco executor to act without bond, and revoked all former wills. It was dated the 27th day of June, 1938, bore a line for the signature of the testator, lines for the signatures of two witnesses, and an attestation clause with two other lines for signatures, following each of which were the words, "residing 353 So. Hoover St., Los Angeles." Julius Pollock, who conducted a steamship and insurance business and had known decedent since 1912, testified that he prepared the will upon instructions of decedent, who stated that he wished to leave all of his estate to his two brothers and did not want to include his brother in Italy or any relations there, "because Mussolini is going to take it away from him"; that he wrote the will on his typewriter, making a carbon copy; that the will was signed by Antonio in his presence and the presence of his wife, Olga Pollock; that he and Mrs. Pollock signed as witnesses; that he, Pollock, asked Antonio to sign the copy also but that Antonio

said he was going to take it along and sign it later; that Antonio put the original and copy in his pocket and said goodbye, and that he, the witness, had never seen the will thereafter. The foregoing testimony was given as a witness on behalf of the contestants. On cross-examination the witness testified that the document presented to him for inspection was the one he had referred to as a carbon copy of the original will he had prepared. He testified that he read the will to Antonio and made an X on the line where he was to sign, and that the X is impressed upon the copy; that he signed on the first lines for the signature of witnesses and that his wife signed on the second, and that the events to which he testified took place on June 27, 1938, in the office of the witness, 308 West Second Street. The witness testified that he was a notary and that he made a notarial record of the date of the will; also, that he had worked for Antonio as general manager of his winery for over two years. Mr. Pollock also testified that soon after Nick died Antonio came to him and asked him whether it would be necessary to make a new will and was told that it would not be necessary, that Nick's children would get their father's share, to which Antonio made no response. The witness saw Antonio frequently thereafter and attended to insurance and transportation matters for him. (He could not recall when Nick died.) Olga Pollock was called by the contestants and testified that she had known Antonio for at least 15 years, that she saw him at her husband's office on or about June 27, 1938, that she assisted her husband in his work, recalled the typing of the will by her husband; she testified that she was asked to sign it and did sign the original of the will but that she did not have her hands on it and did not read it; that it was on the desk when she signed it, that she did not pick it up, nor pick up the copy and when asked if at that time she had knowledge of the contents, replied, "Well, the only knowledge that I had was that Mr. Moramarco came in and told me . . . all I know is that Mr. Moramarco asked Mr. Pollock to make a Will, that he wants to have a will made and Mr. Pollock—— [interruption] Q. At that time you had no knowledge of the contents of the Will? A. I paid no attention to the Will, the contents. Q. As I understand it, you never read it? A. No, I did not. Q. You merely signed it? A. I signed it. Q. Did you ever see that Will again? A. No, I did not. Q. Did you ever see the copy again during the lifetime of Mr. Moramarco? A. No,

I did not, as he took it with him." On cross-examination by counsel for respondents the following testimony was elicited: "Q. I show you what is entitled 'Last Will and Testament' and ask you if you have seen that document before? A. Yes, I have. Q. When did you see that? A. At the time Mr. Moramarco was in the office. Q. At that time was there also another copy of that same Will? A. There was a copy and an original. There were two." She also testified that although she heard Mr. Moramarco state that he wished to have a will prepared and that he gave Mr. Pollock the particulars, she did not pay any attention to it and did not remember what he said about how he wanted his will made out, that the will was read over before it was signed and that Moramarco stated that it was the way he wanted it. When questioned as to where Moramarco had signed the will she indicated the line where there was an X mark, stating that she believed a similar mark was on the original but was not sure of that; that Moramarco signed first, then Mr. Pollock on the first witness line, and also on the first line in the attestation clause, and that she signed in each place under her husband's signature.

As appellants construe section 350 it would mean that the provisions of a lost or destroyed will cannot be proved except by the testimony of two persons who have read the will and have a clear recollection of its contents. We do not doubt that this is an indispensable requirement where the proof consists wholly of the testimony of the witnesses as to their knowledge and recollection of contents of the writing. Such, however, is not the situation here. The question was whether the carbon copy that was exhibited to the witnesses was identified by them as a duplicate of the original will. If it was proved to be a true copy, the terms of the will were thereby established. The code would require in that case that the identity of the copy be proved clearly and distinctly by the testimony of two credible witnesess. There was no uncertainty in the testimony of Mr. Pollock as to the provisions of the will and the sufficiency of his testimony is not questioned by appellants. Their contention is that Mrs. Pollock could not be a competent witness as to the provisions of the will when she had no knowledge of its contents, and we understand their argument to be that never having read the will, and having no recollection as to the contents, she was incompetent to identify the copy as a

true copy. We cannot agree with the latter proposition. It was not her competency to identify the copy, but the strength of her testimony, that was in question. Her examination and cross-examination on this point was surprisingly meager but her testimony was direct and certain, as far as it went.

The unusual feature of the document was that it contained four lines for the signatures of the witnesses, two above and two at the end of the attestation clause. This was convincing evidence that the will was drafted by a person who understood that witnesses were required to sign in both places, as Mr. and Mrs. Pollock testified they did sign, and since the copy conformed to the original in this respect, it is quite evident that the copy was prepared by the same person who wrote the original, namely, Mr. Pollock. The trial court would have been at liberty to disbelieve all the testimony of the two witnesses respecting the execution of the will, but if they had been disbelieved it would have meant that the copy was a spurious document prepared by Mr. Pollock to be offered as a copy of a lost will, and to be proved by the false testimony of himself and his wife. This we think would have been an unwarranted conclusion from the evidence. There was nothing whatever to suggest any motive on the part of Mr. or Mrs. Pollock to prepare a false document. Their testimony bears the imprint of truth. It is quite apparent that Mrs. Pollock was unwilling to testify to facts of which she had no clear recollection. It is true, as emphasized by appellants in their oral argument, that Mrs Pollock was not asked a direct question whether the copy shown to her was an exact copy of the will, but this evidently was considered unnecessary in view of her testimony that it was a carbon copy and the one she had seen before. It is urged also that Mrs. Pollock's testimony carried no weight because she stated no reasons for her belief that the document exhibited to her was the one she had seen at the time of the execution of the will, and which decedent took away with him. She was not asked on direct or cross-examination what reason she had for testifying that the document was one she had previously seen. No objection was made to the question whether she had seen the documents before, and it cannot be assumed now that she had no sufficient reasons, or that she may not have had very good reasons for her identification of it. There were, as we have said, distinguishing features of the writing which might have enabled

the witness to give satisfactory testimony that the document was a true copy, even though she had never read the original. She was questioned closely as to whether she had knowledge of the provisions of the will but it does not appear to have occurred to counsel on either side to question her as to the means by which she identified the document.

The authorities upon which appellants rely are not cases in which copies of the alleged lost will were produced and identified. No useful purpose would be served in discussing the cases cited in which proof as to the provisions of the wills depended entirely upon the recollection of the witnesses.

The question whether the document was clearly and distinctly proved to be a true copy of the original will was one of fact for the decision of the trial court. The statutory requirement of clear and distinct proof is for the guidance of the trial court and has relation entirely to the weight of the evidence. A rule, statutory or otherwise, that the evidence to prove a given fact must be clear and convincing or free from doubt, means that the trial court ought always to be governed by this rule in weighing the evidence and reaching the conclusion as to the facts. (*Mahoney* v. *Bostwick*, 96 Cal. 53 [30 P. 1020, 31 Am.St.Rep. 175].) The rule does not mean that the evidence must be clear and convincing to an appellate court. (*Wadleigh* v. *Phelps,* 149 Cal. 627, 637 [87 P. 93].) Nor does it mean that absolute certainty is to be required in the trial court, but only that degree of proof which produces conviction in an unprejudiced mind. (*Freese* v. *Hibernia Savings etc. Soc.,* 139 Cal. 392 [73 P. 172]; *Couts* v. *Winston,* 153 Cal. 686 [96 P. 357].)

It must be presumed that the trial court proceeded in accordance with the rule, and since the finding that the provisions of the will were proved by two credible witnesses has support in the record, it is not for us to pass upon the weight of the evidence and to determine whether it appears to us to be clear and convincing. (*Brison* v. *Brison,* 90 Cal. 323 [27 P. 186]; *Sherman* v. *Sandell,* 106 Cal. 373 [39 P. 79]; *Estate of Pepper,* 158 Cal. 619 [112 P. 62, 31 L.R.A.N.S. 1092]; *Mead* v. *Mead,* 41 Cal.App. 280 [182 P. 761]; *Bollinger* v. *Bollinger,* 154 Cal. 695 [99 P. 196]; *Steinberger* v. *Young,* 175 Cal. 81 [62 P. 483]; *Steiner* v. *Amsel,* 18 Cal.2d 48 [112 P.2d 635].)

It is earnestly insisted that there was insufficient evidence to prove that the will was in existence at the time of Anto-

nio's death. It was in the possession of the testator, he was competent, and active in his business from the date of the will, June 27, 1938, to the date of his death, November 11, 1944. A diligent search was made for the will by Joe Moramarco, who would have been interested in finding it, but nothing was found except the copy.

Destruction of the will fraudulently or by public calamity during the lifetime of the testator and without his knowledge was not suggested. The evidence, including the presumption hereafter mentioned, which was pertinent to the question of its existence at the time of death, was therefore to be considered with reference to several possible conclusions, (1) that Antonio had revoked the will in writing or by destroying it or having it destroyed with the intention of revoking it (Prob. Code, § 74), (2) that it had been destroyed in some other manner during his lifetime, either with or without his knowledge, or (3) that neither of events (1) nor (2) occurred, or in other words, that the will had been lost by Antonio or deposited by him in some out of the way place that cannot be located.

We shall consider first the question of possible revocation. Where the evidence shows that a missing will was in the possession of the testator and that he was active physically and mentally, a presumption arises that he has destroyed it with the intention of revoking it, and the presumption of the continued existence of a given condition declared in subdivision 32 of section 1963, Code of Civil Procedure, with proof of the existence of the will at some time prior to death is not sufficient to overcome the presumption of revocation. (*Estate of Ross,* 199 Cal. 641, 646 [250 P. 676].)

The immediate question is whether the evidence was sufficient to overcome the presumption that Antonio destroyed the will. The following evidence was material on that issue. Antonio came to California from Italy in 1905; he wrote to his brother Joe in Italy requesting him to come to California and sent him money for his passage. Joe came to California in the following year, and his brother Nick soon thereafter. Antonio and Joe were admitted to citizenship. The three brothers engaged in business together, operating vineyards, a winery, and marketing their wine. Joe and Nick married and had children. Antonio did not marry. A fourth brother, Frank, remained in Italy and died some

14 or 15 years before the death of Antonio, although neither Joe nor Antonio heard directly from Frank's children in Italy concerning his death. When the children of Joe and Nick became old enough they worked in the vineyards and the winery. The three brothers devoted all their time to the business and invested all their money in it. No money was ever received from Frank and he never came to this country. Antonio visited in Italy in 1922, but neither he nor Joe heard from Frank's family or communicated with them after that time. Joe and his family, consisting of his wife and eight children, lived on Yale Street in Los Angeles. The winery was on Mission Road, not far distant. Antonio and Joe lived together from the time they came to California. For some 25 years, ever since the house was built, Antonio lived in Joe's home, paying nothing for room or board. Nick died in January, 1943. About 15 years before Antonio's death additional vineyard property was acquired near Fontana, title being taken in Antonio's name, although it was purchased with money earned in the business.

The three brothers had little money when they came to California, but at the time of Antonio's death owned approximately 1,000 acres of vineyard land. It was estimated that the estate in probate was worth between $300,000 and $400,000. The Moramarcos produced and sold "Old Mission Wine" from their own grapes, and transacted all of their business in Antonio's name. In 1944, the winery was sold, together with most of the office equipment, including a safe. All the papers that had been kept in the winery were moved to another location a short distance away. It was among papers enclosed in a large envelope, stored in a closet, that a copy of the will was found. Antonio maintained a safe deposit box in a branch of the Bank of America. The key to the box could not be found but it was empty when opened after Antonio's death. Antonio died suddenly while driving to the ranch in San Bernardino County.

We have already referred to the instructions given Mr. Pollock for the preparation of the will. He took care of Antonio's personal affairs until the time of the latter's death. Shortly after the death of Nick, Antonio came to Mr. Pollock's office and asked whether it would be necessary to make a new will in view of the death of Nick, and Pollock replied, "I don't know, Tony, but I think that the children would inherit everything that Nick was supposed to get."

Antonio made no response, said "goodbye" and left. He had never expressed to Mr. Pollock or his two brothers any intention to leave anything to his heirs in Italy. He came to Pollock's office frequently, sometimes several times a week. William L. Henry, accountant and manager for Antonio, worked for him from February, 1936, until the time of his death. He testified that the three brothers worked together and that the children of Joe and Nick worked when they became of sufficient age, all without compensation except Theresa, who worked in the office and received a salary. Antonio, when he spoke of his estate to Mr. Henry, always said that the children here would eventually inherit it and he never mentioned the heirs in Italy. A few days before Antonio's death he discussed with Mr. Henry how his affairs might be conducted in event of his death, and Henry suggested that the estate might be incorporated and the stock distributed as he wished. Antonio remarked that as soon as the busy season was over they would go down to an attorney's office "and arrange to do something about that." Mr. Henry asked him at that time if he had a will and he stated that he did have, and the witness, when questioned further, stated that he was positive that Antonio made that statement about four days before his death. He also testified that the papers when moved from the winery were packed in boxes, wine cases, and whatever was available to pack them in, and represented the accumulation of 15 or 20 years. Mr. Henry also testified to a statement made by Antonio to a man who was preparing data for a book, that all the children had contributed to his business and eventually would receive his estate. Michael Moramarco, son of Joe, testified to the work the children did on the ranch and in the winery and in answer to a question whether Antonio mentioned what he intended to do with his property, stated, "well, he mentioned it offhand once in a while. He did say he was going to leave it to us kids, that is about all. He said the ones that worked for him," and he testified that the children never asked to be paid. After he graduated from high school he worked on the ranch for a year for his father and uncle. Joe Moramarco further testified that a few days before Antonio's death at the family home, his, Joe's, wife had asked Antonio what would happen to the property if he should pass away and Antonio replied, "Joe take care of everything." Although Antonio was at the head of the business and the property stood in his

name, it was in every respect a family affair and the business was conducted in all respects as if a partnership had existed among the three brothers. By their combined efforts and the reinvestment of their earnings they had accumulated the property which now represents the estate of Antonio. The terms of the will expressed not only Antonio's wishes with respect to the division of his estate, but they recognized a moral, if not legal, obligation to leave to his two brothers the shares of the estate which they had earned by their labor and other contributions. It was most natural that they should be preferred to the relatives in Italy as to the remainder of the estate. Also, it was reasonable to suppose that Antonio would not have revoked the will without making another one, and that if he had intended to make another will he would have gone to Mr. Pollock, or to his attorney. The circumstances furnished every reason to believe that Antonio was fully satisfied with the will and had no intention other than to leave his estate to his brothers, Joe and Nick, and their families. The evidence was ample to justify a finding that Antonio did not revoke the will.

Proof that the will was not revoked by the testator was not proof that it was in existence at the date of his death. (See dissenting opinion of Mr. Justice Traynor in *Estate of Bristol*, 23 Cal.2d 221, 231 [143 P.2d 689].) However, the fact that it was not revoked would be a patent circumstance tending to show that it was in existence at the date of death. There were additional circumstances, to be mentioned later, tending toward the same conclusion.

It was entirely reasonable for the trial court to believe that the will had not been destroyed by any person intentionally. None of the heirs who were not remembered was in this country, and no one who could have had access to the will had a motive to destroy it. We therefore come to the question whether the court was required to infer, from the fact that the will had been lost, that it had been destroyed. If it was a reasonable inference that it had been lost, but not destroyed, we are bound by the finding of the trial court, even though it would have been, in our opinion, equally or even more reasonable to believe that it had been destroyed.

We are influenced by a practical view of the situation. Where a will cannot be found, where the circumstances strongly indicate that the testator did not destroy it, and that it could not have been destroyed by those who would have

profited by its destruction, no great amount of evidence should be required to justify a finding that it has not been destroyed. This is true because of the practical difficulty of proving, except by circumstantial evidence, what has become of a lost will, or that it has not been destroyed. If there is no evidence pointing toward destruction of the will, other than the presumption previously mentioned, and there is circumstantial evidence of substance tending to prove that it was not destroyed, we are satisfied that the court may properly find that it was in existence at the date of the testator's death. Certainly we may not hold, as a matter of law, that proof that a will cannot be found is also proof that it has been destroyed. The court's finding under attack was required to be based upon the reasonable probabilities. Section 350 does not relate exclusively to wills that are shown to have been lost after the death of the maker, nor does it require a high degree of proof of the existence of the will at the time of the testator's death. Circumstantial evidence and inferences drawn therefrom may be sufficient. (*Estate of Bristol, supra,* 23 Cal.2d 221.) There is no requirement that the existence of the will at the time of death must be proved by some witness who saw it after the death of the testator, and we cannot write into the statute a requirement for direct proof. It therefore follows that in determining whether a will was in existence at the death of the maker, the court should proceed as in the trial of any other question of fact to which the general rules of evidence apply. The statute should be read as an admonition that the court should proceed with extreme care in the matter of proving a lost will, and should be thoroughly satisfied that no fraud is being attempted, but if the provisions are proved with certainty and the court is satisfied that the weight of the evidence is in favor of existence of the will at the time of the death of the testator, it has a duty to so declare. The ultimate question here was whether it was more probable that the will had been merely lost or had been destroyed. Antonio's declarations furnished circumstantial evidence on that point. His statements, made a few days before his death, that he had a will and that if anything happened to him Joe would take care of everything indicated his belief, if not his knowledge, that the will was then in existence. For the reasons previously stated, it was fair to assume that he was referring to the will that was prepared by Mr. Pollock. The fact that the original will was not found with the copy indicated that it

had been put away for safe keeping. It is customary for people who make wills to take good care of them. The trial court may have believed that if the two papers had been kept together and that the original had been destroyed, either accidentally or intentionally, the copy also would have been destroyed. It is our opinion that when evidence was produced showing that it was entirely improbable that the testator had revoked the will in any manner, and when it satisfactorily appeared that no one who had access to the will would have had a motive to destroy it, it became as reasonable to believe that it had been lost as that it had been destroyed accidentally. Accordingly, we must abide by the finding of the trial court.

We do not find in the cases cited on either side any factual situation that resembles in material particulars the facts of our case. It would be idle to point out their distinguishing features for the purpose of showing their inapplicability to the question of the sufficiency of the evidence to prove that the will of Moramarco was in existence at the date of his death.

The judgment is affirmed.

Wood, J., and McComb, J. assigned, concurred.

A petition for a rehearing was denied July 8, 1948, and appellants' petition for a hearing by the Supreme Court was denied August 19, 1948. Carter, J., and Traynor, J., voted for a hearing.