137 Cal.App.2d 555 (1955)
Estate of EMILE H. HOFFMAN, Deceased. CITIZENS NATIONAL TRUST AND SAVINGS BANK OF LOS ANGELES et al., Respondents,
v.
GERTRUDE BLANK et al., Appellants.
Civ. No. 21004. 
California Court of Appeals. Second Dist., Div. One. 
Dec. 6, 1955.
 Adelman, Schwartz & Ferguson and Isaac E. Ferguson for Appellants.
 A. G. Ritter, Rollin L. McNitt, J. Marion Wright and Arnerich, DelValle & Sinatra for Respondents.
 DORAN, J.
 This is an appeal by Gertrude Blank and Bernard Hoffman, children of the decedent, from a judgment admitting to probate a lost will and lost codicil thereto, and a second codicil to said will. The petition for probate, filed by the respondent Citizens National Trust and Savings Bank, named executor, alleges the due execution of the instruments in question; that same had become lost or destroyed and could not be found after diligent search, and the usual jurisdictional facts. It further alleges due execution of the second codicil and that said codicil expressly republishes and reaffirms the previous will and codicil.
 Under the terms of the will and codicils, testator bequeathes $1,000 to each of the two children, $5,000 to friends, Mr. and Mrs. Art McCooey, $100 per month out of income to Sarah Jane Shaffer. The residue of the estate is given to the Los Angeles Unit Shrine Crippled Children's Hospital, Inc., and in case any part of the hospital bequest should lapse or fail, then to Ernest L. Hurst, recorder of Al Malaikah Temple of the Shrine.
 Objections were filed by the two children on the ground that the second codicil was not subscribed or acknowledged by decedent in the presence of the attesting witnesses, present at the same time, that decedent did not declare "that it was his will or a codicil to his will"; that the witnesses did not sign the instrument at decedent's request and in his presence; that "no exact date of purported subscription, *557 acknowledgment or attestation appears in the instrument," the codicil being dated "June __________, 1953"; and that the second codicil is ineffective because the original will and first codicil are not admissible.
 Contestants' objections to the admission of the original will and first codicil were and are that the same were "not entitled to be admitted to probate as lost or destroyed instruments pursuant to the provisions of section 350 of the Probate Code of California, since it does not appear that said will and codicil were actually in existence at the time of decedent's death, or destroyed fraudulently or by public calamity in the lifetime of the decedent."
 After a three-day hearing, the trial court found that the contestants' material allegations were not true except that the second codicil "was executed in June 1953 on or about the 16th day thereof but that the exact date of said execution is not set forth in said codicil."
 It was further found that the decedent had never revoked the will or first codicil "which came into the possession and custody of decedent at the respective dates thereof and remained in his possession and custody continuously thereafter until some time prior to his death; that it is true that no person other than decedent saw said will and first codicil at any time after March 28, 1950; that it is true that decedent rented a safe deposit box from Citizens National Trust and Savings Bank of Los Angeles and made nine entries into said safe deposit box in the year 1950, two entries in 1951, one entry in 1952, and one entry February 2, 1953, and that upon decedent's death neither said will or codicil were found in said safe deposit box. The court finds that it is true that said will and first codicil were in existence at the time of decedent's death and have either not been found or have been lost or destroyed by some person other than decedent."
 It is appellants' contention that "For lack of any evidence that the will of March 14, 1950 and codicil of March 28, 1950 were in existence when the maker died on November 27, 1953, these instruments were not admissible to probate under Section 350 of the Probate Code. The second codicil falls with the missing will and first codicil; or independently, because not executed in compliance with section 50 of the Probate Code. Accordingly, the judgment of the trial court should be reversed."
 The appellants' position is untenable. From a partisan consideration of the record appellants have sought to draw *558 certain conclusions and inferences contrary to those adopted by the trial court. The rule of appellate review is, however, directly opposed to this procedure where the record discloses substantial evidence in support of the trial court's findings. That the record in the present litigation abundantly sustains the findings and judgment cannot well be doubted.
 According to the testimony of Attorney Ritter, the testator, on March 10, 1950, went voluntarily to the attorney's office and expressed a wish to leave the bulk of the property to the Shrine Crippled Childrens Hospital. The testator mentioned the two children who are appellants herein, but not the fact that a former wife was still living. After conference with the attorney the will was drawn and executed by Hoffman on March 14, 1950.
 On March 20, 1950, Hoffman again went to the attorney's office for advice as to the charitable bequests, and directed the drafting of a codicil which provided that if any part of the bequest to the Childrens Hospital should fail, then the same should go to the recorder of Shrine, Al Malaikah Temple as an individual. Such a codicil was drawn and executed by Hoffman on March 27, 1950. Both in the case of the will and this codicil, the decedent was given the original and a carbon copy, Attorney Ritter retaining another carbon copy. Neither Ritter nor the secretary, who were the witnesses, ever saw the executed copies after March 28, 1950.
 On June 12, 1953, Attorney Ritter was requested to visit Hoffman, then a patient at La Vina Sanitarium in Altadena, and did so, talking along the office carbon copies of the will and first codicil. Ritter testified that Hoffman "wanted me to be sure and to promise him that I would see that the property was left and distributed in the way which his will indicated." The attorney mentioned each item in the will and Hoffman stated that no change was desired except that a $5,000 bequest to Christ Mission of New York City should be stricken out and that sum given to "a couple of friends who have been very good to me by the name of McCooey." As to the rest of the will, Hoffman said: "I want that the way it is left." Likewise, as to the first codicil, decedent said: "That is just the way I want it and I'm counting on you to see that my wishes are carried out."
 The second codicil, just mentioned, was found among the decedent's papers and on its face appears to be regular. There was no question as to the signatures of either the testator or the witnesses. The original will and first codicil were not *559 found. The second codicil was not executed by Hoffman in the presence of the attorney, but was later signed by the testator on "June __________, 1953," as the instrument states, and bears the signatures of two nurses as attesting witnesses. It is claimed by appellants that the two witnesses did not sign at the same time but separately entered the room for that purpose.
 Grace L. Works, one of the nurses witnessing the codicil, testified that the decedent was in bed at the time and the codicil was on a cabinet nearby; that Hoffman "asked me if I would be willing to sign this. It was a codicil to his will"; that decedent then signed the paper in the witness' presence and that the other witness was not then present but came into the room two or three minutes later; that testator asked Mrs. Works to find another witness, whereupon, "I stepped to the door, Mrs. Krone was in the hallway, and I called to her and she came over to me and I said, 'Mr. Hoffman wants to see you; he wants you to sign a paper'."
 Mrs. Krone then walked over to the decedent, and then returned to Mrs. Works and said, "Its a will--he wants me to sign his will. Is it all right?" whereupon Mrs. Works said, "Yes, it is all right. I have signed it." Mrs. Krone then witnessed the paper. At that time Mrs. Works was standing in the doorway which was then open, and Hoffman's bed was about 5 feet from the door.
 The testimony of Mrs. Krone was substantially similar, but to the effect that the door "was just open a short distance," and that Mrs. Works "was about four or five feet from me down the hall, right catty-corner from the door," or about 9 feet from the bed. Appellants contend that "the testimony of Mrs. Works and Mrs. Krone is replete with irreconcilable contradictions and inherent falsities," and that the evidence shows that the second codicil was not executed in compliance with the statutory requirements.
 [1] As said in Estate of Emden, 87 Cal.App.2d 115, 120 [196 P.2d 627], "whether or not a will has been executed in accordance with the statutory requirements is a question of fact and the trial court's determination on that issue cannot be overturned unless it is without support in the evidence." Such is the situation in the instant case.
 An examination of the cases dealing with the subject indicates judicial approval of a liberal and practical interpretation of the statutory provisions requiring a testamentary instrument to be executed by the testator in the "presence" of *560 two attesting witnesses who shall sign the will in the "presence" of the testator. As stated in Estate of Tracy, 80 Cal.App.2d 782 [182 P.2d 336]," 'Presence' is defined in Webster's New International Dictionary, second edition, 1939, page 1955, thus: 'The part of space within one's ken, call, influence, etc.; immediate nearness or vicinity of one; proximity'." The same opinion notes that "In a number of decisions where the meaning of the word 'presence' has arisen in connection with the execution of wills, the courts have adopted what is known as the 'conscious presence rule.' "
 In Estate of Miner, 105 Cal.App. 593 [288 P. 120], quoting from the headnote, where "the first witness was in the same or an adjoining room with the door open during all the time the second witness was present, and heard and saw everything that was said or occurred between the testatrix and the second witness with the exception that she did not see the latter sign, the conduct of the testatrix could not be construed otherwise than as a declaration to the attesting witnesses 'present at the same time', that the instrument was her will."
 So, also, in Estate of Jacobs, 24 Cal.App.2d 649 [76 P.2d 128], a similar rule of liberal construction was followed, and "the trial court was justified in finding the due execution of the will; and ... was not compelled to accept as true the testimony of one of the beneficiaries, which was slightly at variance with that of the other witness, as to where the latter was standing while the doctor was writing and reading the will."
 [2] From these and other cases, the so-called "one transaction" and "conscious presence" tests have been applied with salutary and practical results. In the present case, the testator's signing of the document and indication of desire and intention to have the witnesses attest it as a will, shortly followed by the actual signing by the two witnesses, as hereinbefore set forth, constitute but a single transaction. At most, the witnesses and the testator were separated by only a few feet and perhaps by a partly closed door; this was nothing if not within the testator's "conscious presence."
 [3] Viewing the evidence as an entirety, and in the light most favorable to the trial court's findings, it is true, as stated in respondents' brief, that "testator at all times referred to his will as being in existence and at no time made any indication of a desire to revoke or destroy it. In his last codicil, which was executed by him in June, 1953, he declared over his signature that he expressly reaffirmed and *561 republished the provisions of his previous will and codicil. ... So also in October, 1953, shortly before his death, he again referred to his will and requested his attorney to see that his wishes should be carried out in that regard. There is nowhere in the record any evidence to the contrary."
 It is not known what happened to the original, executed drafts of the will and first codicil, but the record affords substantial evidence in support of the trial court's finding "that said will and first codicil were in existence at the time of decedent's death and have either not been found or have been lost or destroyed by some person other than decedent." To require more than this would be to demand the impossible. There is no question as to the authenticity of the carbon copies of these instruments, nor that, with the executed second codicil, these documents represent the testator's testamentary wishes. Appellants' contentions are without merit.
 The judgment is affirmed.
 White, P. J., concurred.
 NOURSE (Paul), J. pro tem., [fn. *]
 Dissenting.
 I concur in the majority opinion insofar as it holds that the so-called second codicil was executed and witnessed in the manner required by law.
 I dissent from the majority opinion insofar as it holds that the evidence herein is sufficient to uphold a finding that the original will and first codicil were in existence at the time of the testator's death, and I am further of the opinion that the findings of the trial court are so conflicting as not to constitute in fact a finding that said will and codicil were in existence at the time of the testator's death.
 There is little conflict in the evidence here and the evidence establishes the following pertinent facts:
 The original will and first codicil were both drawn by decedent's attorney and executed by decedent in March of 1950. By their terms the contestants, who are the children and natural objects of the testator's bounty, were each given legacies of $1,000, and the balance of the testator's substantial estate was devised and bequeathed to strangers to his blood.
 The second codicil was executed in June, 1953. It referred to the original will and the first codicil and substituted two friends as legatees in place of one of the charities who were legatees under the original will and codicil. *562
 At the time of the execution of the original will and at the time of the execution of the first codicil, the executed originals and the first carbon copies were handed by the attorney, who drafted them and who was one of the witnesses thereto, to the testator. After the date of the execution of the first codicil, the original will and copy thereof and the first codicil and the copy thereof remained in the possession of the testator and were never seen by any other person.
 On October 1, 1953, the testator asked his attorney to be sure that the terms of his will were carried out. Between that date and the date of his death on the 26th of November, 1953, he made no mention of his will. After the testator's death a search was made for the original will and codicil, copies of which had been retained by the attorney who drew them, but although this search was very thorough, neither the will nor the first codicil nor the copies thereof, which had been retained by the testator, could be found. The second codicil and a copy thereof, together with numerous other papers relating to the decedent's business affairs, and the keys to his safe deposit box, were found in a satchel which the testator had in his possession at the time he drew the second codicil to his will (this was drawn in a sanitarium) and which he had kept with him from that time until his death.
 The contestants were residents of an eastern state and at no time had any means or opportunity of securing possession of the will and first codicil or destroying them. The only persons who had the means of access to the will were persons who either had nothing to gain or lose by destruction of the original will or codicil, or who stood to benefit by their continued existence.
 The evidence further shows that the decedent had divorced his wife, the mother of the contestants, many years before his death and had left his first wife to raise and care for the contestants; that much of the last year of his life was spent in sanitariums and hospitals and that during the nearly two months that elapsed between his last mention of his will and the time of his death, he was a very ill person and must have known that death was impending.
 The respondents offered the first will and codicil for probate as lost wills and it was incumbent upon them to prove that these wills were in existence at the time of the testator's death, or that they had been destroyed fraudulently or by public calamity in the lifetime of the testator without his knowledge (Prob. Code, 350). *563
 From the facts which were established by uncontradicted evidence that the wills in question were in the possession of the testator from the date of their execution; that they were never in the possession or seen by any other person and that they could not be found at his death, the presumption arises that they had been destroyed by the testator (Estate of Ronayne, 103 Cal.App.2d 852, 856 [230 P.2d 423]; Estate of Bristol, 23 Cal.2d 221, 224 [143 P.2d 689]; Estate of Johnston, 188 Cal. 336, 339-340 [206 P. 628]). This presumption may be overcome by other evidence, direct or indirect. If there is evidence upon which an inference contrary to the presumption may reasonably be drawn, and the trial court draws that inference, then it is the duty of this court to uphold the findings of the trial court as to the existence of the will at the time of death (Estate of Ronayne, supra, p. 857; Estate of Bristol, supra, pp. 224-225; Estate of Moramarco, 86 Cal.App.2d 326, 334 [194 P.2d 740]).
 The inference that the will was in existence must, however, be based upon facts from which the inference can reasonably be drawn. It seems to me that the facts in this case do not furnish the basis for such an inference. The only facts which it is claimed furnish a basis for the inference are that the second codicil, which refers to the lost wills, was found among the testator's papers; that he had mentioned his will approximately two months before his death; that he had, on numerous occasions after the drafting of the original will, stated that he intended to leave the greater part of his estate to the charitable institution which is the chief beneficiary under the lost will and codicil, and had mentioned as recipients of his bounty the two persons who are made legatees by the second codicil; that he felt an animosity towards his children, the contestants, because of their failure to loan him money upon request, although this animosity was not expressed during the last year of his life. These facts do not, in my opinion, furnish any basis for the inference that the wills were in existence at the time of death, and therefore, cannot stand as evidence against the presumption that he had destroyed them. The most that can be said for them is that they constitute evidence that the wills were in existence as late as October 1, 1953, some two months before his death. If these facts are a sufficient foundation for the inference that the will and first codicil were in existence at the date of death, then mere proof of their execution would likewise furnish a basis for that inference. The only difference in the foundation *564 is that of time. If the wills had been executed on October 1, 1953, and could not be found two months later, at the time of death, it certainly could not be contended that the provisions of section 350, Probate Code, had been met. Yet under these facts, the proof of their existence on October 1st, would have been conclusively established by direct evidence and that is the only fact which the indirect evidence offered here establishes. It is the law that the presumption declared by subdivision 32 of section 1963, Code of Civil Procedure, that a thing once proved to exist continues to exist, will not aid one who seeks to prove a lost will (Estate of Ross, 199 Cal. 641, 647 [250 P. 676]). How, then, can an inference be used to accomplish this same purpose? Yet that is exactly what has been done here, for, as I have pointed out, the evidence which is the alleged basis for the inference only proves the existence of the wills on October 1st, nearly two months prior to death.
 When the facts depended upon here to establish the existence of the wills at the date of death are considered in the light of the further admitted facts that the testator was, during the approximately two months that elapsed since his last mention of his will and his death, faced with the knowledge of impending death, and the fact that his will and codicil, for all practical purposes, disinherited his natural children, whose care and maintenance he had left to their mother, they cannot constitute any basis for the inference mentioned, but support the inference or presumption, whichever it may be, that he himself had destroyed his will.
 The present case seems to me to be distinguishable on the facts, from the cases relied upon by the proponents. In the Estate of Bristol, supra, 23 Cal.2d 221, the lost will admitted to probate was a natural will and there was opportunity for, and motive for it to have been destroyed by a person adversely affected by it, and shortly before his death, the testator had taken actions from which it could be reasonably inferred that his will was then in existence. It was upon the basis of these facts that the Supreme Court held that the finding of the trial court that the will was in existence at the time of death would not be disturbed by the appellate court.
 In the Estate of Moramarco, supra, 86 Cal.App.2d 326, the will was a natural will and its destruction would have enabled the Italian government to expropriate a substantial portion of his estate, a situation which the testator had expressed himself as desiring to make impossible. The testator's papers *565 had, shortly before his death, been moved from one place of safekeeping to another and it was probable that in the moving the will in question had been lost and the testator had within three days of his death mentioned his will as in existence.
 In the Estate of Ronayne, supra, 103 Cal.App.2d 852, the testatrix, two days before death, had stated that the alleged lost will was in her home but that she was not sure where, and upon her death her husband, who was left but $100 by the will, took possession of the home and all its contents and made search for the will impossible.
 In the Estate of Reynolds, 94 Cal.App.2d 851 [211 P.2d 608], the testator had mentioned the will as in existence two days prior to death.
 In the Estate of Reid, 79 Cal.App.2d 34 [179 P.2d 353], there was evidence that the will had been destroyed by the testatrix' former husband after the date of death, and the trial court so found.
 In the Estate of Dean, 62 Cal.App.2d 418 [144 P.2d 849], there was evidence that a person adversely affected by the alleged lost will had come into possession of it after the testator's death and destroyed it. There was also evidence that the testatrix had, within 10 days of her death, twice stated that she had a will and that the same was in her safe deposit box to which box the person whom the court found had destroyed the will had access.
 It is apparent that in each of the cited cases there was evidence that the will was in existence shortly before death and that, with the exception of the Moramarco case, someone other than the testator had the opportunity to and the motive to destroy the will. In the case at bar, none of these facts exists and on the contrary, we have the motivating facts that the will in question was unfair to the natural objects of the testator's bounty, and for two months after any mention of his will he was faced with this fact and the fact of impending death.
 Assuming, however, that the facts here permit an inference that the wills were in existence at the time of death, the findings seem to me to be so in conflict as to destroy any basis for this inference as drawn by the trial court. The trial court's findings upon this issue are as follows:
 "... that it is not true that decedent revoked said last will or codicil or first codicil at any time prior to his death, ...; that it is true that said will and first codicil came into the possession and custody of decedent at the respective *566 dates thereof and remained in his possession and custody continuously thereafter until some time prior to his death; that it is true that no person other than decedent saw said will and first codicil at any time after March 28, 1950; ... that upon decedent's death neither said will or codicil were found ... The court finds that it is true that said will and first codicil were in existence at the time of decedent's death and have either not been found or have been lost or destroyed by some person other than decedent." (Emphasis added.)
 The findings that we have italicized are that the will and codicil were in the exclusive possession of the testator, that they never were seen by any other person and therefore were not in their possession, and that they went out of the possession of the testator prior to his death. These findings are only consistent with the inference or presumption that the wills had been destroyed by the testator, for if they had been misplaced by him they would still remain in his possession and as they were never seen by any other person they could not have been fraudulently destroyed by any such person. In face of these findings there is no basis for the finding of the ultimate fact of the existence of the wills at the time of death, and there is not one iota of evidence in the record to support the finding that the wills were lost or destroyed by some person other than the decedent. In fact the evidence is to the contrary and the finding that they were never seen by any other person is to the contrary.
 I would reverse the judgment.
NOTES
[fn. *] *. Assigned by Chairman of Judicial Council.