307 P.2d 654]

[Civ. No. 8786.   Third Dist.   Mar. 8, 1957.]

Estate of MARY ETHEL SITTON, Deceased. BEATRICE E. SITTON, as Special Administratrix, etc., Appellant, v. LILA LILLIAN HARVEY, Respondent.

Ware & Kutz, A. B. Ware and George P. Kading for Appellant.

J. Oscar Goldstein, P. M. Barceloux, Burton J. Goldstein and Goldstein, Barceloux & Goldstein for Respondent.

WARNE, J. pro tem.*—Contestants appeal from an order admitting a lost holographic will to probate and dismissing the contest thereof. Proponent of the lost will was Lila Lillian Harvey, sister of decedent, Mary Ethel Sitton, hereafter referred to as Ethel Sitton. Contestants were Elgan W. Sitton and Beatrice E. Sitton, parents of the deceased husband of the decedent. Contestant Elgan W. Sitton having died during the pendency of the proceedings, the appellants are Beatrice E. Sitton, individually and as special administratrix of the estate of Elgan W. Sitton, deceased.

Ethel Sitton, the decedent, was the surviving widow of G. W. (Buck) Sitton, the son of Elgan W. and Beatrice E. Sitton and when Buck died, she inherited his entire estate, all of which was community property. There were no surviving children of the marriage.

Ethel Sitton died September 14, 1952, as the result of injuries sustained when an automobile she was driving overturned. No will was found. At the time of her death, the decedent resided in her own home at Durham, a few miles south of Chico, California. She worked as a bookkeeper for an appliance store in Durham, managed by Robert Edmiston. Another employee of the store was Eugene Conant.

In June of 1952, Ethel scheduled a trip east with a Mrs. Steadman. Prior to her departure she sought an appointment with Attorney James William Morgan of Chico about making a will. This appointment and a subsequent appointment were not kept, but either on June 18 or 19, 1952, during a telephone conversation he instructed her on the requirements of a holographic will. Morgan testified that following this conversation, "right shortly before" noon on the 19th, Ethel came to his office, identified herself, showed him a piece of paper and asked him if it was any good. The instrument was purportedly witnessed by Eugene Conant and Robert

---

*Assigned by Chairman of Judicial Council.

Edmiston. It was dated either the 18th or 19th of June, 1952. To the best of Mr. Morgan's recollection the instrument read: "To whom it may concern, I am going on a trip east and in the event that anything happens to me (death) all my possessions are to go to Lila Harvey." He further testified that he asked her if she signed it and she said she had.

Eugene Conant testified that he signed the instrument Ethel executed, although he did not remember whether the will was dated. He stated that when he first saw the instrument Ethel had just finished writing it and was signing her name. He stated that he was familiar with Ethel's handwriting, and that it was entirely in her handwriting; that he read the will, and by its terms all of her property was left to her sister, Lila.

Robert Edmiston testified that on the 18th or 19th of June, Ethel Sitton phoned him and asked him to sign a letter that was on his desk at the store where they both worked. The next morning he read and signed the letter as a witness. He stated that it was entirely written, dated and signed in Ethel Sitton's handwriting. He also testified that the letter read: "To whom it may concern, I am leaving on a trip east, if anything should happen to me, all my worldly belongings to go to my sister Lila Harvey, . . ." It was signed "Mary Ethel Sitton." He also testified that when he signed it, Eugene Conant's signature was on it.

There was testimony that after Ethel made the will, she had often declared to friends and relatives that she wanted her property to go to her sister, Lila. Mr. Conant testified that Ethel mentioned the will and to whom her property was to go, at her home in August of 1952. He also testified that on September 13, 1952, at the store in Durham, Ethel said, "some day she knew everything she had would go to her sister, Mrs. Lila Harvey." Mrs. Steadman testified that before they left on the eastern trip, Mrs. Sitton said, at the Steadman home, on June 20, 1952, "I even made out a will," and that on the way back from the eastern trip, Mrs. Sitton said, "everything was fixed up 'for my sister.'" A Mrs. Cudd testified that in Mrs. Sitton's cabin at Butte Meadows two weeks before her death, Mrs. Sitton mentioned her will and stated that "she thought everything was settled and that she had left everything to Lila." And when asked, "Did she tell you then she had a will made out?" Mrs. Cudd answered,

"As far as I remember, yes, she had a will, I know she had taken a trip before then . . . and she told me she had things fixed . . . so her sister would have everything." Mrs. Krajcerik testified that at the Butte Meadows cabin in August, 1952, Mrs. Sitton said, "she had made out her will and was leaving everything to mother." Mrs. Krajcerik and her mother, Lila Harvey, the respondent, were present at a dinner on September 10, 1952, celebrating the 50th birthday of Mrs. Sitton. Mrs. Krajcerik testified that on that occasion Mrs. Sitton told "mother she had' everything fixed for her so mother would have whatever was hers." And referring to what Mrs. Harvey said on that occasion, Mrs. Harvey testified, "She told me that night she had it fixed so I would get everything."

A Mrs. Hadley, an employee in a grocery store next door to the appliance store in which Ethel worked, and an acquaintance of Ethel, testified that on the day that Ethel left on her trip east she had a conversation with her in which Ethel said, "Well, I am going home to make my Will"; and, asked whom she was going to leave her money to, Ethel said, "I guess I will leave it to my sister on this trip"; that after Ethel returned from the east, she had another conversation with her in which the will was again mentioned, and that Ethel said, "But I tore that up." It is to be noted that this statement, in part, is contrary to Ethel's statements made to several of the other witnesses at a later date and amounts to nothing more than a conflict in the evidence.

At about 2:10 a. m. on September 14, 1952, Mrs. Sitton left a café in the town of Orland and had driven her car about 5 miles east thereof, when the accident occurred. Her purse was found about 250 to 300 feet south of the vehicle and off the highway in the weeds. It was open. It contained no money, no identification, no keys or anything. Identification and other papers kept by Mrs. Sitton in the sun visor of her automobile were missing. All that was located by way of identification was a 3A card issued to a Mrs. Sitton and an automotive repair bill bearing the name "Ethel Sitton." So far as is known, no one saw the accident.

Sometime before noon on September 14, 1952, the undertaker delivered to Mrs. Harvey certain keys on a large safety pin, one of the keys being a key to Mrs. Sitton's home. A small key ring containing the car keys and also a key to the home was never accounted for. On the afternoon of the day of the accident, Mrs. Harvey, with several other people, went

to the home of her sister Ethel at Durham. They found the house in a state of disorder. The desk in which Ethel kept her private papers and which she kept locked had been broken open and the papers were disarranged and scattered over the floor. The lights were on. Clothing in the wardrobe closet was off the hangers and strewn on the floor. Books were pulled from the shelves and left open on the floor. A black tin box, in which Ethel kept papers and things of value, was missing.

Contestants argue that there is no evidence that the letter of June 20, 1952, was in existence at the time of the death of Ethel Sitton on September 14, 1952, and assert that "any claim that there was proof of the existence of such a letter at the time of decedent's death is based wholly on speculation and conjecture." We do not believe that there is merit in this contention. ██ True, there was no direct proof. However, direct proof is not necessary. The existence of a will at the testator's death is to be proved as any other question to which the general rules of evidence apply. It may be proved by circumstantial evidence and the inferences which may reasonably be drawn therefrom. (*Estate of Moramarco,* 86 Cal.App.2d 326 [194 P.2d 740]; *Estate of Ronayne,* 103 Cal.App.2d 852 [230 P.2d 423].) ██ As pointed out in the statement of facts, both before and after the execution of the will of June 20, 1952, Mrs. Sitton referred to respondent as the object of her bounty, and on many occasions after she returned from the east in July, 1952, and even as late as September 10, 1952, just four days prior to her untimely death, she stated that respondent was to have everything. These facts, coupled with the evidence as to the state of disorder in which decedent's home was found on September 14, 1952, including the breaking open of the decedent's desk where her private papers were kept, and the fact that, after what thus appeared to be a search for some document, the tin box in which she kept papers and things of value was missing, and, finally, the proof supplied by the contestant Elgan W. Sitton, in his testimony that, on the afternoon of the day of Ethel's death, someone phoned his daughter that a letter written by Ethel had been found, and that the letter stated that she was going on a trip back east, and that if anything happened to her, everything she had was to go to Lila, all combined to furnish satisfactory evidence that the will was in existence at the time of the death of testatrix.

Contestants also urge that the findings addressed to the issue of the will's existence were erroneous, being contradictory, and that the said findings do not dispose of the issues presented by the pleadings. The argument is not sound. Findings that the will had been in existence and unrevoked at the death of the decedent, that due search and inquiry after her death had failed to produce the will, do not conflict with each other, nor do either of them conflict with the further finding that the will was lost sometime between the date it was executed and the day after decedent's death; neither do these findings lack any essential element.

Appellants also contend that the provisions of the will were not clearly and distinctly proved by at least two credible witnesses. This contention is without merit. As heretofore stated, both Edmiston and Morgan testified that the will was entirely written, dated and signed by the testatrix. Eugene Conant, other than not remembering whether the will was dated, also testified concerning the provisions of the will. When Edmiston signed it, Conant had already signed, and Edmiston said it was dated. The contestants challenge the credibility of the witness Morgan. It was the function of the trial court to weigh his testimony and to pass upon its credibility, to resolve conflicts and to harmonize seeming conflicts, if possible. There is nothing incredible, as a matter of law, in Morgan's testimony that he saw the holographic will which Mrs. Sitton had signed, that it was dated and that the names of Conant and Edmiston were signed thereto as witnesses. The court found that the will was dated June 20, 1952. The testimony was that it was dated between June 18 and 20, 1952. The material fact is that it was dated. The specific date is immaterial. (*Estate of Reynolds,* 94 Cal.App.2d 851, 853 [211 P.2d 608].)

The order appealed from is affirmed.

Van Dyke, P. J., and Peek, J., concurred.