In the Matter of the ESTATE of Harvard L. WHEADON, Deceased.

Iris Jensen and Ellen PIERCY, Plaintiffs and Appellants,

v.

George WHEADON, John Wheadon, and Bertha Tilbury, Defendants and Respondents.

No. 15329.

Supreme Court of Utah.

May 11, 1978.

2. *Chamblee v. Stocks & Tibbetts*, 9 Utah 2d 342, 344 P.2d 980.

3. *Sawyers v. Sawyers*, Utah, 558 P.2d 607.

Johnson & Spackman, J. Brent Garfield, David S. Walsh, Salt Lake City, for plaintiffs and appellants.

Ray, Quinney & Nebeker, James L. Wilde, Jensen & Lewis, Kay M. Lewis, Salt Lake City, for defendants and respondents.

MAUGHAN, Justice:

This case deals with the question of whether a lost will should be admitted to probate, under the laws of the Probate Code as they existed before the enactment of the Utah Uniform Probate Code in 1977. The appellants (hereinafter referred to as petitioners) petitioned the court below to admit the will to probate, and respondents (hereinafter referred to as objectors) objected to the petition, and asked in their own petition that decedent's estate pass by the intestacy laws of Utah. The matter was tried to a jury, at the close of all the evidence, the trial court directed a verdict in favor of objectors, and ordered the estate distributed according to the intestacy laws. We reverse, and remand for trial. Costs to appellants. All statutory references are to Utah Code Annotated, 1953.

The decedent, Harvard L. Wheadon, died on April 14, 1976. He was never married, and left no issue. He was survived by the objectors, George Wheadon, John Wheadon, and Bertha W. Tilbury, who are his brothers and sister. Also surviving him were the petitioners, Iris Jensen and Ellen Piercy, who are the daughters of Melvin Wheadon, the decedent's brother who died in 1971.

Decedent executed a will on May 24, 1955, which left all his personal and real property to his brother, Melvin, and also named him executor of the estate. The parties do not dispute the contents of the will, which were proved by a conformed copy kept by decedent's lawyer. The execution of the will was adequately proved, and the parties stipulated to the decedent's mental capacity to make a valid will. Decedent's lawyer, Mr. Dahl, testified he remembered the execution of decedent's will, but not whether the decedent kept the original at that time. However, Mr. Dahl's usual practice at that time was to give the client the original will, and his office records did not indicate he kept the original. In any event, apparently no one who testified at trial ever saw decedent's will after its execution.

In 1971, about two weeks after Melvin Wheadon died, decedent called his lawyer and stated he wished to name a new executor, since Melvin had died. On February 19, 1971, decedent executed a codicil in Mr. Dahl's office naming Judy Burton and Sue Bateman, who had been decedent's neighbors, as executrixes. The codicil made no other changes to the will, and the decedent expressed no dissatisfaction to Mr. Dahl with the distribution of the estate in the original will. Decedent asked Mr. Dahl to keep the original of the codicil, and decedent retained a copy, which was found in his safety deposit box after his death.

After decedent's death, a diligent search of his house was made, and also of Mr. Dahl's office. The safety deposit box was opened, and the copy of the codicil was found. Mr. Dahl found the conformed office copy of the will. On the morning of the trial, the tissue copy (normally given to the testator) also was found. The original will was never found, and no evidence exists tending to show it was destroyed, or merely lost.

From a review of the record, it appears Harvard L. Wheadon was aware of the importance of having a will. He wisely contacted an attorney to prepare and help him properly execute his will in 1955. In 1971, when his brother Melvin, the named executor, died, he again contacted his attorney to change executors by executing the codicil. Lawrence Leake, an old friend of decedent, testified decedent, at least twice, told him to get his affairs in order, or the "state will tell you where your estate is going." Ray and Joyce Shephard, who were decedent's neighbors and friends for the last five years of his life, stated by affidavit decedent told them several times he had a will and that anyone who did not was foolish. Judy Burton, who was decedent's neighbor for years, stated she and decedent had a conversation about wills in March, 1976, approximately one month before decedent died. Judy's stepfather had

recently died without a will and she and decedent discussed the problems it created. She testified decedent indicated it was very important to have a will, and that everyone should have one. She asked, "Harvard, do you have a will?" He responded, "Yes, it's in my safety deposit box." On April 11, 1976, three days before decedent's death, Judy Burton took him to the hospital, where he was to undergo surgery. After hearing a news bulletin on the radio that Howard Hughes had died and no will had been found, decedent expressed disgust that someone with such wealth would not have his affairs in order. To Darlene Oakeson, another friend and neighbor who was married to Judy Burton's brother, decedent indicated in March of 1976 that he was upset that her husband's stepfather died without leaving a will, and he stated his affairs were in order.

█ A well-established presumption of law exists as follows: when it is shown the testator made a will of which he had possession, or access to, but that it could not be found at his death, the law presumes the testator destroyed it himself, with the intent of revoking it. This presumption can be rebutted by sufficient evidence as was done in *In re Frandsen*.[1] Such evidence may include declarations of the testator, which indicate his state of mind regarding the importance of his will, or his attitude toward the beneficiaries named in the will.[2]

█ Considerable evidence exists in this record tending to overcome the presumption decedent destroyed his will *animus revocandi*. We have noted decedent made statements to five people regarding the importance of having a will, or of having one's "affairs in order." These included statements made one month before he died to Judy Burton that he had a will, and to Darlene Oakeson that his affairs were in order, in the context of a discussion about wills. As he was going to the hospital, where he died three days later, he gave the

1. *In re Frandsen's Will*, 50 Utah 156, 167 P. 362 (1917); *In re Estate of Enz*, 33 Colo.App. 24, 515 P.2d 1133 (1973).

2. *In re Bristol's Estate*, 23 Cal.2d 221, 143 P.2d 689 (1943); *In re Estate of Enz*, note 1, supra.

impression by his comments his affairs were in order. In addition to such comments, decedent's actions in promptly returning to his attorney to execute a codicil after his brother died, who was the named executor in the will, illustrate decedent was diligent in attending to matters affecting the will. That the codicil only changed the executor and expressly reaffirmed the other provisions of the will indicates that in 1971, the decedent still felt the same way about the disposition of his estate as in 1955, and that his will existed at that time. In view of decedent's attitudes, had he destroyed his will with the intent to revoke it after 1971, it is likely he would have contacted his attorney again to execute a different will, or at least to notify him to destroy the original of the codicil, which Mr. Dahl kept.

Decedent and Melvin, his brother, were apparently very close, and lived together many years. Petitioner Ellen Piercy was raised in the same house with decedent for about ten years; she testified that during that time, "decedent was like a second father to me." The only testimony regarding any ill feelings of decedent toward petitioners was that decedent tried to buy some land adjacent to his home from them, which they had inherited from Melvin in 1971, and that decedent was disappointed because they would not sell him the land. No evidence at all was presented indicating any dissatisfaction of decedent with his will, and no evidence exists showing decedent made any will other than the one executed in 1955. In addition, no evidence was presented to show any bad feeling between decedent and Melvin, nor, with the exception of the incident mentioned above, between decedent and petitioners. Also, as long as he was alive, he believed the will was in existence, and that it would govern the distribution of his estate.

A more difficult problem now arises, relating to the statutory language in the Probate Code which deals with lost or destroyed wills. On this point a majority does agree. Section 75-3-26 states:

> No will shall be proved as a lost or destroyed will, unless the same is proved to have been in existence at the time of the death of the testator, or is shown to have been fraudulently destroyed in the lifetime of the testator, nor unless its provisions are clearly and distinctly proved by at least two credible witnesses.

Objectors contend the petitioners have failed to establish the existence of the will, at the time of decedent's death. "In existence," they argue, means the paper on which the will was written must be physically produced. They state that if these words mean merely that the will must be in existence in the contemplation of the law, then the words, "or is shown to have been fraudulently destroyed in the lifetime of the testator" would be surplusage, since a will could not be fraudulently destroyed if the document need not be produced.

Petitioners assert the words "in existence" must mean legal existence, or, the will was unrevoked in the testator's lifetime. They state if physical existence of the document is required, then this section of the code contradicts the statutes which specifically spell out the ways in which a will can be revoked.[3] Petitioners argue since the statute only allows revocation by another testamentary instrument or by destruction with the intent to revoke, the will of decedent in this case was never revoked, because no such instrument exists and no proof exists decedent destroyed the will intending to revoke it. If physical existence of the will is required under section 75-3-

---

3. Section 74-1-19 states:

. . . no written will, nor any part thereof, can be revoked or altered otherwise than:

(1) By a written will, or other writing of the testator declaring such revocation or alteration executed with the same formalities with which a will should be executed by such testator;

or

(2) By being burned, torn, cancelled, obliterated or destroyed, with the intent and for the purpose of revoking the same, by the testator himself, or by some person in his presence and by his direction.

26, then the will of the decedent cannot be probated, and manifest unfairness results since the valid, unrevoked will which decedent intended to have govern the distribution of the estate cannot do so.

Both arguments have appeal, and the briefs of the parties illustrate that both are supported by cases in states with similar statutory provisions. It is difficult to compare the cases, however, because of the various statutory differences, and also because of the factual distinctions in the cases. Evidently the courts attempt to construe similar statutes in a manner which will prevent unfairness to the parties involved, which may explain why the decisions are difficult to harmonize.

The purpose of section 75–3–26 is to prevent spurious wills from being probated. In construing the language thereof, we intend to keep that purpose in mind, while at the same time rendering a construction that is fair and reasonable. This court stated in *In re Frandsen's Will*:[4]

. . . the statute is regarded as remedial, and hence should be given a fair and reasonable construction and application. That is, if the whole purpose of the statute can be subserved, the court, in furtherance of justice, may well give its provisions a fair and even a liberal construction rather than a narrow and strict one, when to do so would be unfair or unjust.

In that case, the testatrix made a will and later became insane. The will was shown to be in existence at the time she became insane, but not at her death, some fifteen years later. This court held, for purposes of compliance with what is now section 75–3–26, the death of the testator was the time of her "mental death," and the will was therefore in existence at the time of her "death." The court thus reached what it considered was the fair and just result by liberally interpreting the word "death" in the statute.

Turning to the case at hand, we conclude the words "in existence" in the statute should be construed as meaning "in legal existence." By so doing we do not say that all that is necessary to probate a lost will under the old code is to overcome the presumption of revocation. The proponent of a lost will must still comply with section 75–3–26, and with 75–3–25, which together require proof of the proper execution of the will, the validity thereof, and the contents thereof by at least two credible witnesses. This construction will continue to promote the purpose of 75–3–26, while avoiding an unfair result which would arise under a strict interpretation. We feel this view is more agreeable with the intent of section 74–1–19, which clearly provides a lost or an accidentally destroyed will is nevertheless valid and unrevoked.

Our construction of the statute finds support in several other states which have wrestled with this problem. The Minnesota Supreme Court concluded that legal existence was all that was necessary under statutes similar to Utah's, *In re Havel's Estate.*[5] The court concluded a different interpretation would, in effect, add a new way to revoke a will under the statutory scheme, since a valid but lost will could not be probated, and the legislature did not intend such a result.

The New York Court of Appeals has reached the same result by slightly different means, under the same statute. In *In re Fox' Will,*[6] the testator's will was destroyed in Germany by Allied bombs. Faced with the literal language of the statute making such an accidently destroyed will unqualified for probate, the court construed the words "fraudulently destroyed" as meaning simply the will was either accidentally lost or was destroyed without the testator's knowledge or consent. The will, which had thus been "fraudulently destroyed," was admitted to probate.

The Colorado Supreme Court considered the question under its statute which is simi-

4. Note 1, supra p. 364.

5. 156 Minn. 253, 194 N.W. 633 (1923).

6. 9 N.Y.2d 400, 214 N.Y.S.2d 405, 174 N.E.2d 499 (N.Y., 1961).

lar to Utah's, but does not contain language dealing with fraudulent destruction, in *In re Eder's Estate*.[7] The court noted:

> And a will, once validly made and published, remains a will, although the writing, the best evidence of it, in the absence of intent to revoke, be lost or destroyed. Thus considered, the word "existence" in our statute has to do with the will of the testator as manifested by his intent that the terms of the writing shall be carried out on his death. There is no good reason a testator should be decreed to have died intestate, and his wishes, solemnly committed to writing, be defeated by the loss or destruction of what is, after all, merely the best, and not the only, evidence of his desires.[8]

Acknowledging authorities to the contrary, we nevertheless feel our view yet promotes the purposes of the statute, but will lead to more fair results than would a narrow interpretation of the language.

WILKINS, J., concurs.

CROCKETT, J., concurs specially with comments by separate opinion.

HALL, J., concurs in the views expressed in the concurring opinion of CROCKETT, J.

ELLETT, C. J., dissents by separate opinion.

CROCKETT, Justice (concurring specially with comments):

I concur in remanding this case for a trial and also agree to these propositions: that there is a dispute in material issues of fact which must be resolved in order to determine whether the will in question was the valid and existing will of Harvard L. Wheadon at the time of his death; and that it was therefore error for the trial court to take the case from the jury. But I think it would be improper for the decision of this Court to be regarded as indicating how the issue of fact should be resolved.

Under our law, the trial court does not comment on the credibility of the evidence, nor upon the effect thereof. It is my thought that, except to indicate that there is sufficient evidence to raise a jury question, this Court's opinion should respect that same standard and leave determination of the credibility of the evidence and the effect thereof to the fact-trier.

The main opinion correctly states that where the testator had possession of the will and it cannot be found after his death, there is a presumption that he revoked it; but that this presumption can be rebutted by "sufficient evidence."

The term "presumption" is but descriptive of a process of reasoning in determining facts. It means that from the showing of the existence of certain facts, viewed in the light of common sense and experience, it is reasonable to assume that the presumed fact exists;[1] and that it should be so found to exist unless sufficient countervailing evidence is adduced that reasonable minds might find to the contrary, in which case there is a dispute for the fact-trier to resolve on the basis of judging where the greater probability of truth lies.[2]

It is my view that in this case there is the presumption of revocation; and that there is contrary evidence, which the fact-trier (court or jury) *may* believe, but is not necessarily required to believe, is sufficient to overcome the presumption. I agree with the view expressed in the main opinion that it is not absolutely necessary that there be physical production of such a will.[3] There is also a presumption that anything shown to be in existence at a given time continues to exist unless the contrary is shown. The fact-trier can properly also consider that

7. 94 Colo. 173, 29 P.2d 631 (1934).

8. 94 Colo. at p. 182, 29 P.2d at pp. 634, 635.

1. See 29 Am.Jur.2d, Evidence, Sec. 160, P. 194.

2. See *Miller v. Commonwealth*, 172 Va. 639, 2 S.E.2d 343; and Wigmore states that "In strictness, there cannot be such a thing as a conclusive presumption." Wigmore, Evidence, (3rd Ed.) Sec. 2492; also deprecating the idea of absolute presumptions, see discussion in Jones, Commentaries on Evidence, (2d Ed.) Sec. 42.

3. See *In re Frandsen's Will*, Footnote 1, Main Opinion.

presumption, along with the presumption of revocation above referred to, together with all of the other circumstances shown in the case in determining whether the greater probability of truth is that the decedent had a will at the time of his death than that he had revoked it. But I do not think the evidence in this case should be regarded by this Court as compelling a finding that there was such a valid will in existence. My opinion is that an opportunity should be given to both sides to fully present their evidence and their arguments and, without any directive as to prejudgment thereon, permit the jury (or trial court as fact-trier) to resolve the critical issue above stated.

HALL, J., concurs in the views expressed in the concurring opinion of CROCKETT, J.

ELLETT, Chief Justice (dissenting):

It would seem that a jury could infer that the decedent had a will three days before his death. It does not take three days for a man to change his mind or to destroy his will.

When it is shown that a man made a will which he kept in his possession, or which he had access to, and it cannot be found at or after his death, there arises a presumption that during his lifetime he destroyed it.[1]

The statute[2] in force and effect at the time of the death of the testator and at the time of the petition to probate the lost will read:

> No will shall be proved as a lost or destroyed will, unless the same is proved to have been in existence at the time of the death of the testator, or is shown to have been fraudulently destroyed in the lifetime of the testator, nor unless its provisions are clearly and distinctly proved by at least two credible witnesses.

There was no proof in this case that the will was fraudulently destroyed during the lifetime of the testator.

It seems clear to me that the trial court ruled correctly in holding that there could be no probate of the non-existent will. I would affirm its ruling and award costs to the respondent.

---

1. *In re Frandsen's Will*, 50 Utah 156, 167 P. 362 (1917).

2. U.C.A., 1953, 75–3–26.