(No. 28388.—)

*In re* ESTATE OF WILLIAM M. MORGAN.—(IRENE TIBBITS,
Appellee, *vs.* MARY ANN SMITH *et al.*—OSCAR E. CARL-
STROM, Admr., Appellant.)

*Opinion filed January 17, 1945—Rehearing denied March 19, 1945.*

GEORGE O. HEBEL, and OSCAR E. CARLSTROM, both of
Aledo, for appellant.

BELL, FARRAR & SCOTT, (BENJAMIN S. BELL, and
ROBERT M. BELL, of counsel,) all of Rock Island, for ap-
pellee.

Mr. Justice Stone delivered the opinion of the court:

Appellant, who is administrator of the estate of William M. Morgan, deceased, appeals from an order of the circuit court of Mercer county admitting to probate a carbon copy of a will of Morgan.

Facts, not disputed, are as follows: On June 29, 1936, Morgan executed a will, of which the instrument admitted to probate is admittedly a carbon copy. This will was left with his attorney in Monmouth until 1938 when, at Morgan's request, it was mailed to him. For some years prior to the birth of appellee, Irene Tibbits, the beneficiary under Morgan's will, he lived with her people in Keithsburg. He was living with them when she was born and continued so to do until she was about seven years of age, when he went to live by himself. When appellee was about twelve years of age she started taking care of Morgan's rooms and lived with him until her first marriage at about 16 or 17 years of age. After one year, she was divorced from her husband and subsequently married Kenneth Tibbits. During the time she was married to her first husband and from 1932, after her second marriage, she took care of Morgan's house. She and her second husband lived with him and helped him with the tavern business in which he was engaged.

On July 12, 1943, Morgan was found in his home dead from bullet wounds. He had accumulated about $20,000 in realty and personal property. He had been engaged in the fish and tavern business. He disposed of these shortly before his death. After his death, a thorough search was made among his papers for the will executed by him in 1936, but no such will was ever found. The following spring, appellee petitioned the county court of Mercer county to admit the carbon copy of this will to probate. Upon an order refusing to admit it, appeal was taken to the circuit court where a hearing was had *de novo* and that

court admitted it to probate. As real estate is involved, the appeal comes directly to this court.

The evidence shows that Morgan was, what is characterized in the record as, a "periodical drinker;" that two or three times a year he would go on drunken sprees and remain thereon from four to six weeks, as a result of which he would become ill. During all these times, the appellee took care of him, tended to his house and his business affairs and, as she testified, went to the bank and prevented his drawing more money to spend foolishly. The record is replete with evidence of service rendered by her during most of her life from the time she was 12 years old. The will made in 1936 gave her all his real and personal property.

In support of the petition to probate the will, the court heard evidence of numerous witnesses who told of conversations had with the deceased a short time before his death, in which he spoke of the will he had executed and expressed an intention to leave all his property to appellee, also stating on numerous occasions that he did not intend to leave anything to his relatives, with whom he seemed to have had little contact. Appellant complains here that such evidence is not sufficient to justify the order admitting this will to probate. He calls attention to the familiar rule that where a will has been in control of the testator and, upon his death, cannot be found, it will be presumed to have been destroyed by him *animo revocandi*, and the burden is upon one seeking to probate such will to prove that it was unrevoked at the testator's death. Counsel for appellee argue, on the other hand, that proof of the physical existence of the will at the time or after the death of the testator is not necessary; that in order to overcome the presumption of destruction by the testator *animo revocandi*, it is necessary only to offer evidence which shows that the will was not revoked by the testator before his death.

The question involved is whether Morgan's will, of which a true copy has been ordered admitted to probate, is entitled to be probated as his last will and testament. This issue, as we have stated, gives rise to the query whether proof offered by the appellee in this case is sufficient to overcome the presumption of revocation by the testator. It is well settled in this State that the presumption of destruction *animo revocandi* is subject to being rebutted by circumstances which tend to show a contrary conclusion. (*Holler* v. *Holler,* 298 Ill. 418; *In the Matter of Page,* 118 Ill. 576.) Appellant cites numerous cases where this court has held that the presumption was not overcome and denied probate of the will. Since the question is whether the evidence in this record sustains the chancellor's order admitting the will to probate, other cases decided on other facts by this or other courts constitute little assistance in the determination of a case of this kind. The test applied in the cases which have been before this court, is whether the evidence shows that it is unlikely that the testator destroyed his will. To determine this, evidence of the statements made by the testator a short time before his decease is competent. As was held in *In the Matter of Page,* 118 Ill. 576, it is not necessary that the court be able to determine what happened to a will if there is evidence that indicates it was not revoked or cancelled by the testator. In this case, some nine witnesses testified to statements made by the deceased indicating his execution of a will and his steadfast purpose to leave his property to appellee. The dates of these statements ranged from a few months to a few days before his death. Two of these witnesses testified that he stated that the lawyer who admittedly drew the will, a carbon copy of which is offered in probate, drew his will. One Arnold Bennett testified that about May 1, 1943, when Morgan closed his tavern, the witness was helping him to move his things out and

that he then told him he was going to leave Irene well fixed. On another occasion, at or about that time, this witness was sorting Morgan's papers and picked up an envelope. The deceased said to him, "Give that to me, that is my will." The witness described the envelope as being a long white envelope.

Each of appellee's witnesses testified to feelings shown by the deceased, not only of greatest regard for the appellee, stating that she is the only person who had ever done anything for him, but of displeasure with his relatives whom he said never helped him, saying: "They will never get a cent of my money." It is unnecessary to set out all of this testimony in detail. There is no contradiction of any of these witnesses as to what they heard or saw. Two witnesses, sisters, who were distant relatives of the deceased but who would not inherit as his heirs, testified to a conversation with him some months before his death, in which, as they testified, he declared that the appellee had been mean to him and that he thought it was about time for him to do something for his own family, and that he had had a will but he had destroyed it. The chancellor, who heard and saw these witnesses, stated he did not believe them. Their testimony contains much reason for his disbelief. Their statements are not only contrary to those of all the witnesses who have testified to a constant and continuing high regard on the part of the deceased for the appellee, but the conversation testified to, had it occurred, antedated by some months statements made by the deceased of his unswerving purpose to leave his property to appellee. These were the only witnesses offered on behalf of the appellant. Without detailing the testimony offered on behalf of the appellee, it is clear from reading it that the deceased was in nowise likely to have destroyed his will. Statements made within ten days of his death indicate a fixed determination to leave his property to the appellee. This testimony comes from disinterested friends

who had known him intimately for many years and who had talked to him about his property and affairs shortly before his death.

While the presumption is, as we have indicated, that a will, last traced to the testator's possession and which can not be found after his death, has been destroyed by him with intent to revoke it, yet where the testimony all shows an attitude of mind and statements of the testator not only inconsistent with such revocation but contrary to it, courts are justified in concluding that the presumption has been rebutted.

As was said in the early English case of *Davis* v. *Davis,* 2 Addams Eccles. 223, "All his [testator's] declarations to the Burtons and others are fully confirmatory of his alleged intention to give the residue of his property to Mrs. Davis. * * * But the instrument is not found upon the death of the testator; and, as it was left in his possession, the legal presumption is that he himself destroyed it *animo revocandi.* This presumption, however, may be repelled by evidence; nor does it require evidence amounting to a positive certainty, but only such as reasonably produces moral conviction. The whole conduct of the deceased, and his declarations down to the very evening of his death, render it most highly improbable that he should have revoked this codicil."

Appellant cites cases of this court as supporting his claim that the evidence in this case does not overcome the presumption. *St. Mary's Home* v. *Dodge,* 257 Ill. 518, so cited, differs widely in the facts. There, the evidence showed that the testatrix made a will disinheriting her husband, and that statements were made by her to the effect that she did not want him to receive her money and that she had started divorce proceedings against him. The evidence also showed, however, that about four months before she died, the divorce bill was dismissed and a reconciliation was effected with her husband and that statements

were made by her that he had taken unusual care of her during the last two or three weeks of her life and she was somewhat worried about his welfare because he had been up for two or three weeks looking after her. She also made a statement to a very good friend the day before she died, that her affairs were not in order; that she did not have a will.

*Griffith* v. *Higinbotom,* 262 Ill. 126, also cited by appellant, is likewise a case differing widely from this one on the facts. There, the evidence showed numerous slips of paper upon which the testator had written, but no one had seen a will or copy of it. There was no evidence of the contents of the will. In that case, proponents of the supposed lost will attempted to establish it by declarations of the testator as to what the will contained. This, as that case holds, cannot be done. The evidence also showed different attempts to execute codicils, all of which tended to strengthen rather than rebut the presumption that the testator destroyed his will.

*Holler* v. *Holler,* 298 Ill. 418, also cited by appellant, varies widely from this case on the facts. The testator had made his will leaving most of his property to his son. It was not found. He also had daughters. He was heard to state, a little while before his death, that he considered his will unfair; that he wanted his children all to think the same of him after he had gone, and there was other evidence of a change in his feelings towards his daughters.

So with *Leemon* v. *Leighton,* 314 Ill. 407, where the testatrix had her will drawn in December, 1921. This was properly executed. Eight days later, she executed a codicil revoking part of it. A few months later, another person drew a new will for her, making an entirely different disposition of her property. This will was not properly executed. After her death, the second will was found but the signatures of the witnesses had been cut off. The first will could not be found. The court in that case found an abund-

ance of evidence to the effect that the testator was dissatisfied with the will and had destroyed it. *Koester* v. *Jennings,* 334 Ill. 107, is also cited by the appellant. The evidence there tended to establish the will sought to be probated was a forgery. No statements were made by the testator in any way bearing upon the execution or existence of the will.

Among cases of other jurisdictions wherein it has been held that statements of the testator, of the existence of a will a short time prior to his death, may amount to sufficient proof to overcome the presumption of revocation, are *Jackson* v. *Hewlett,* 114 Va. 573, 77 S. E. 518. That case is quite like the one before us on the facts. The court there held that declarations of the testator as to the disposition of his property, coupled with the actual execution of a will, were sufficient to overcome the presumption of revocation, the court there saying: "The declarations of the testator establish a continued and unchanged purpose as to the disposition he desired to make of his estate * * * and negative the suggestion that he had destroyed his will *animo revocandi."* It was held by the same court in *Bowery* v. *Webber,* 181 Va. 34, 23 S. E. 2d 776, that repeated declarations of the testatrix subsequent to making the will and only a short time before her death, that such a will had been executed and was still in her possession, together with the entire lack of evidence of any cause or reason for her to have made a change in her testamentary disposition of her property, was sufficient to overcome the presumption of revocation. To the same effect is *In re Flood's Estate,* 47 Cal. App. 809, 119 Pac. 2d 168, and *Eder's Estate* v. *Methodist Ass'n,* 94 Colo. 173, 29 Pac. 2d 631.

In *In re Ziegenhagen's Will,* 148 Wis. 382, 134 N. W. 905, the testator's will could not be found after his death. There, the evidence showed the consistent determination on the part of the testator to leave the principal portion of

his property to his daughter Augusta Wendt, and it was held to be ample to support a finding of the court below to the effect that the deceased did not destroy his will with intent to revoke it. So with *Churchill* v. *Dill*, 145 Kan. 306, 65 Pac. 2d 337, in which case it was held that declarations of the testator shortly before his death to the effect that the will he made "stands," together with evidence showing declarations of his feelings and attitude toward other members of his family who would be the natural objects of his bounty, and toward the beneficiaries named in the will, were sufficient to support the finding that the will had not been revoked.

In this case an unchanged attitude on the part of Morgan as to the disposition of his property, and of his feelings toward the appellee, together with his often-stated purpose that his relatives should not receive any of his money, as they had never done anything for him but to try to "live off him," when such evidence was undisputed and no attempt was made to show any reason why he should want to revoke his will shortly before his death, evidently convinced the chancellor that the presumption of revocation was overcome. The chancellor heard and saw the witnesses and is in better position than we, reading from the record, to judge the truthfulness of their testimony. The record contains ample reason for sustaining his conclusion that the will of Morgan, though not found after his death, was not destroyed by him with intention to revoke it, and since the carbon copy of his will is, without dispute, authentic, the circuit court did not err in ordering the will probated. The order of the circuit court is, therefore, affirmed.

*Order affirmed.*