194 Ill. App.3d 219 (1990)
550 N.E.2d 1201
In re ESTATE OF BESSIE STRONG, Deceased (Earsie Greenlaw et al., Respondents-Appellants,
v.
Arthur Greenlaw, Petitioner-Appellee).
No. 1-88-1553.
Illinois Appellate Court  First District (1st Division).
Opinion filed January 29, 1990.
*220 Diane Ainsworth & Associates, of Chicago, for appellants.
Abelski & Associates, Ltd., of Chicago (Sidney Abelski and Scott Bagnall, of counsel), for appellee.
Order affirmed.
PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:
Following Bessie Strong's (decedent's) death on July 17, 1986, Ethel McCoy filed a "Petition for Letters of Administration" in the circuit court of Cook County, alleging that her sister died intestate. In response, Arthur Greenlaw (petitioner), decedent's nephew, filed a "Petition for Probate of Missing Will and for Letters Testamentary," attaching thereto a purported copy of decedent's will.
Following a hearing, pursuant to section 6-4 of the Probate Act of 1975 (the Act) (Ill. Rev. Stat. 1987, ch. 110 1/2, par. 6-4), the circuit court entered an order admitting a copy of decedent's will to probate and denying McCoy's "Petition for Letters of Administration." In so doing, the circuit court concluded that petitioner offered sufficient competent evidence to overcome the presumption of revocation.
Decedent's brothers, nephew, and other heirs at law (respondents) appeal from the judgment admitting the will to probate as decedent's last will and testament, contending that the evidence was insufficient to rebut the presumption of revocation. For the reasons set forth below, we affirm.
Decedent's estate consisted of her home and a nine-unit apartment building, both of which were valued at $75,000, $2,000 in personal property and $10,000 in annual income from the rental building. The will offered by petitioner devised and bequeathed all of decedent's property to petitioner and designated him as executor.
The following testimony was adduced at the hearing on the admission of the missing will to probate. Louise Marchman, who had been involved in the management of decedent's rental building since *221 1955, testified as follows: She had contact with decedent one or two times each month up until her husband's death in "1980 or 1981," and up until decedent's death in 1986 spoke to decedent one to two times each week and would visit her at least once each month. Decedent sought Marchman's opinion regarding both financial and personal matters and telephoned Marchman whenever she was lonely. Decedent would mention petitioner during their conversations and would say "nice things about him," such as "the only one that cares * * * about me is Arthur" and that "Arthur's the closest thing I have to a son." Decedent relied upon petitioner up until the time of her death. On one occasion decedent informed Marchman that her "business" was in order, and that "[petitioner] knew all her business."
Marchman further testified that throughout her 34-year relationship with decedent, decedent did not discuss family members other than petitioner. Marchman was aware that decedent had brothers, but not that she also had sisters. The first time Marchman met decedent's brothers was during the week preceding decedent's death.
Marchman testified that she visited decedent on the Wednesday prior to her death at decedent's request. Marchman stated that Earsie Greenlaw, decedent's brother, followed her into the bedroom where the decedent was lying down on the bed and created a tense atmosphere. She was never left alone with decedent. Marchman further testified that she was permitted to read a copy of decedent's unsigned will.
Decedent's attorney, Robert Snow, testified that subsequent to William Strong's death, decedent expressed a desire to place her real estate in joint tenancy with petitioner. He advised against a joint tenancy arrangement and instead recommended that she dispose of her property by will or a land trust with a remainder beneficiary. He informed decedent that if she died intestate her relatives would inherit her estate.
Robert Snow and Martin Snow, his father, testified that they prepared a will naming decedent's nephew, Arthur Greenlaw, as sole beneficiary. Robert testified that her decision to name petitioner as sole beneficiary was based upon the fact that she had estranged relatives whom she did not even know and other relatives that she saw only minimally over long periods of years.
Attorney Martin Snow testified that decedent told him that her brothers were no help to her and that her sisters did not come and visit her. Martin and Robert also testified to the events surrounding the execution of the will on February 4, 1982. The will was executed in Robert's, Martin's and their secretary's presence. They observed *222 decedent sign the will. Both Robert and Martin signed as witnesses to her signature in the presence of one another, decedent, and their secretary. Robert offered to retain the executed will in a safe deposit box, but decedent opted to take the will home with her. Martin and Robert testified to the authenticity of a copy of the will attached to petitioner's petition to admit the will to probate as a copy of the will drafted for decedent. Robert further testified that the copy of the will at the hearing was the same will executed by decedent. Martin stated that decedent requested that he send a copy of the will to Marchman, but that he sent a draft copy directly to decedent due to ethical considerations relating to client confidentiality. Robert and Martin testified that decedent never contacted them again regarding the February 4, 1982, will or any other will.
Petitioner testified to the following: He visited decedent two to four times each month, on Christmas, and six to seven other holidays each year. He had driven decedent's brothers, Otis, Earsie and Timothy Greenlaw, back and forth from their home in Gary, Indiana, to decedent's home in Chicago, Illinois, on numerous occasions. When decedent was hospitalized at Jackson Park Hospital in 1982, he visited her regularly. He further testified that in 1984, he visited decedent four times during her four-day admission to South Community Hospital. He also transported decedent's brothers Earsie and Timothy Greenlaw to the hospital, and in 1985 or 1986, he picked up Earsie on three occasions when he again visited decedent in South Community Hospital. He frequently took decedent to visit his father, Sir Carter Greenlaw, who lived in Gary, Indiana.
Petitioner further testified that he signed all necessary documents for the decedent's funeral arrangements and that the day after decedent's death he searched for a sewing basket in decedent's bedroom because this is where decedent told him she had left her will. Although he had seen the sewing basket approximately two weeks prior to decedent's death, he was now unable to locate the sewing basket or the will. The sewing basket reappeared in the closet after decedent's funeral, absent any will or a copy of a will.
Petitioner testified that various household items, including linen, a telephone with a radio, and a small television set were missing from decedent's home. Decedent's rings, diamond watch and mink coat were also missing.
Jennifer McWilliams, decedent's next-door neighbor for 12 years, provided the following testimony: Decedent introduced petitioner to McWilliams, but never introduced or mentioned any other relatives. She conversed with decedent on a daily basis. She testified that decedent *223 told her that the petitioner was always there for her and that she could count on him. Decedent always had a smile on her face when she talked about petitioner. She also had the opportunity to observe petitioner and decedent, and noticed them talking and laughing in the yard. She was aware that petitioner cut decedent's grass and shoveled her snow. She believed decedent loved petitioner and that there was never a change in these feelings.
Yolanda Greenlaw, petitioner's ex-wife, testified that decedent indicated to her that petitioner was a "very good person." She further testified that decedent relied upon petitioner in numerous matters.
Bessie Challon Greenlaw (Challon), decedent's niece, testified that she lived with decedent for approximately 18 months beginning in February 1983. Decedent told her that petitioner, at one time, refused to make a household repair at decedent's home and that decedent on one occasion told petitioner not to cry over his father's death because "he had did his father so dirty" when he was living. She did not notice a will while residing with decedent, and decedent never mentioned a will. Challon's testimony also disclosed that a Mr. Coleman cut "the grass * * * and fix[ed] things around the house."
Katie Mosley, decedent's former co-worker, testified that she first became acquainted with decedent in 1965. She moved into decedent's house approximately two to three weeks after Challon moved in and remained there for nine months. She never became aware of decedent's business papers or a will and was not familiar with McWilliams, decedent's next-door neighbor. She was very good friends with Earsie Greenlaw, decedent's brother. Subsequent to her moving from decedent's house, she visited decedent on a daily basis. Decedent told her that she wished to change her will and was going to call her lawyer regarding the change. Mosley first testified that the conversation initiated in 1987. After the circuit court noted for the record that decedent died in 1986, Mosley contradicted her testimony on three occasions by testifying that the conversation took place in 1988, 1985 and 1986.
Mosley stated that no one else lived with decedent. Decedent informed her that petitioner was not going to "get her property and stuff," and that decedent "thought [petitioner] was trying to do something slick." Decedent never had a nice thing to say about petitioner, although petitioner talked with decedent everyday and visited decedent more than any other family member. She further testified that decedent had telephoned petitioner, and on several occasions, petitioner had hung up on her.
Mosley's testimony further provided that decedent owned a mink *224 coat, a television, two rings and a watch. She testified that these items were missing subsequent to decedent's death, but she never inquired as to their whereabouts.
Monique Greenlaw, petitioner's daughter, testified that decedent informed her in 1985 that she kept her will in a wicker sewing basket located in the middle bedroom of her home. She went to decedent's home after the funeral to locate the decedent's will and found a copy of the will in the sewing basket and in a drawer in the dining room.
She further testified that she accompanied Earsie and Timothy Greenlaw, Ethel McCoy and her daughter, Tobiatha, and Katie Mosley to area banks following decedent's death to determine their interest in the four or five bank books that were said to exist. She testified that one account containing $4,000 named petitioner and decedent as joint tenants. Two accounts in the amounts of $37,000 and $26,000 named Earsie and Timothy Greenlaw, along with decedent, as joint tenants. Another account containing $35,000 named Earsie and decedent as joint tenants. They searched for a safety deposit box, but one was not located. Monique testified that she overheard Katie Mosley state that "[she] want[ed] the house." Monique's testimony also disclosed that decedent made loans to Timothy Greenlaw and petitioner and these loans were never repaid.
Ethel McCoy testified that three days prior to decedent being admitted to the hospital, she was the only person living with decedent. She further testified, in contradiction of earlier deposition testimony wherein she stated that she received decedent's bank books while the decedent was lying in bed, that decedent handed her some door keys and bank books while decedent was being carried out on the stretcher to the ambulance. Thereafter, McCoy testified that decedent gave her the bank book and keys inside the house.
Earsie Greenlaw, decedent's brother, testified that he was frequently in decedent's home prior to her death. He also testified that he resided in decedent's house subsequent to her death, and that petitioner, Timothy Greenlaw and Katie Mosley all had keys to decedent's house. He testified that he never took anything from decedent's home.
 1 Initially, we address petitioner's first procedural contention that respondents have not invoked the jurisdiction of this court under Supreme Court Rule 304(b)(1) (107 Ill.2d R. 304(b)(1)). Rule 304(b)(1) provides:
"Judgments and Orders Appealable Without Special Finding. The following judgments and orders are appealable * * *:

*225 (1) A judgment or order entered in the administration of an estate, guardianship, or similar proceeding which finally determines a right or status of a party." (107 Ill.2d R. 304(b)(1).)
Committee Comments on Rule 304(b)(1) provide:
"Subparagraph (1) applies to orders that are final in character although entered in comprehensive proceedings that include other matters. Examples are an order admitting or refusing to admit a will to probate * * *." (107 Ill.2d R. 304, Committee Comments, at 399.)
We believe that our jurisdiction has been properly invoked here under Supreme Court Rule 304(b)(1) (107 Ill.2d R. 304(b)(1)). Under Rule 304(b)(1) (107 Ill.2d R. 304(b)(1)), orders admitting wills to probate subsequent to a section 6-4 hearing under the Act (Ill. Rev. Stat. 1987, ch. 110 1/2, par. 6-4) are appealable. See In re Estate of Millsap (1979), 75 Ill.2d 247, 388 N.E.2d 374; In re Estate of Marcucci (1973), 54 Ill.2d 266, 296 N.E.2d 849; In re Estate of Lynch (1982), 103 Ill. App.3d 506, 431 N.E.2d 734.
 2 Petitioner next argues that Larguster Jones, decedent's nephew, lacks standing to bring this appeal on the grounds that he was not a party to the action in the circuit court. We disagree.
The fact that Jones was not a party to the action in the circuit court does not prevent his joining in this appeal. Supreme Court Rule 301 (107 Ill.2d R. 301) provides that "[a]ll rights that could have been asserted by appeal or writ of error may be asserted by appeal." A nonparty has standing to appeal if he has a direct, immediate and substantial interest in the subject matter, which would be prejudiced by the judgment or benefited by its reversal. In re Estate of Tomlinson (1976), 65 Ill.2d 382, 387, 359 N.E.2d 109, 111; Flanagan v. Hulman (1970), 121 Ill. App.2d 382, 387, 257 N.E.2d 599, 601.
Jones' interest in this litigation is sufficient to meet the above test. If the order admitting decedent's will to probate is reversed, Jones may inherit a portion of decedent's estate under the rules of intestate succession. Since Jones has a direct, immediate and substantial interest in the subject matter, which would be prejudiced by the circuit court's order or benefited by its reversal, he is a proper party to the instant appeal.
We now turn to respondents' contention on appeal that the circuit court erred in its finding that the presumption of revocation, arising from nonproduction of the original February 1982 will, was overcome by the evidence presented by petitioner. We find that the circuit court's conclusion was amply supported by the evidence.
*226  3, 4 The law is well established regarding lost or missing wills. It is established:
"Where a last will and testament, after its execution, is retained by the testator and cannot be found upon his death, it is the well-settled rule of this and of the majority of jurisdictions that it will be presumed to have been destroyed by him animo revocandi. [Citations.] The same cases establish that the presumption is subject to being rebutted by circumstances which tend to show a contrary conclusion, and that the burden is on one seeking to probate such a will to prove that it was unrevoked at the testator's death." (In re Estate of Moos (1953), 414 Ill. 54, 57, 110 N.E.2d 194, 195, noted in In re Estate of Millsap (1979), 75 Ill.2d 247, 250, 388 N.E.2d 374, 376-77.)
(See also In re Estate of Weir (1983), 120 Ill. App.3d 18, 20, 458 N.E.2d 134, 136; In re Estate of Netherton (1978), 62 Ill. App.3d 55, 57-58, 378 N.E.2d 800, 802.) Factors to be considered in addressing the rebuttal of the presumption include evidence as to statements from the testator that he did not intend to revoke the will, evidence that he entertained a kind and loving attitude toward the proposed beneficiary under the will up to the time of death, and evidence of other individuals' access to the will prior to death. (See Moos, 414 Ill. 54, 110 N.E.2d 194; In re Estate of Morgan (1945), 389 Ill. 484, 59 N.E.2d 800; Holler v. Holler (1921), 298 Ill. 418, 131 N.E. 663; In re Estate of Deskins (1984), 128 Ill. App.3d 942, 471 N.E.2d 1018; Jackson v. Jackson (1971), 132 Ill. App.2d 66, 268 N.E.2d 62.) In cases where the issue is raised whether some person has unlawfully destroyed a missing will, however, it will not be presumed that a missing will has been destroyed by any other person, without the knowledge of or authority of the testator, although such person may have had the motive and the opportunity, as that would be presuming a crime. Moos, 414 Ill. at 60, 110 N.E.2d at 197; Holler, 298 Ill. at 432, 131 N.E. at 669; St. Mary's Home for Children v. Dodge (1913), 257 Ill. 518, 526, 101 N.E. 46, 49.
Our supreme court has noted that because the evidence with respect to any rebuttal will vary from case to case, other cases "constitute little assistance in [making] the determination" whether the presumption has been overcome. (Morgan, 389 Ill. at 487, 59 N.E.2d at 801; see also Moos, 414 Ill. at 60-61, 110 N.E.2d at 197.) We therefore determine the instant case on its own facts, in light of the above rules.
 5 Based on a review of the evidence, we find that petitioner *227 presented sufficient evidence to overcome the presumption of revocation. The record indicates that decedent directed the preparation of the February 4, 1982, will, and the will was executed and attested to on that date. The original of decedent's will, along with unexecuted copies of the will, was retained by decedent and placed in a wicker sewing basket at her residence. Both petitioner and his daughter were informed of the will's location. Before decedent's death, petitioner searched decedent's house for the will, but was unable to locate the will. After decedent's funeral he returned to decedent's home and found the wicker sewing basket, absent any will or a copy of a will. Subsequent to decedent's death, Monique Greenlaw, petitioner's daughter, located a copy of the will in the sewing basket and an additional copy in a drawer in decedent's dining room. The original will was never found.
Testimony disclosed that decedent expressed a strong desire to make a will for fear that her estranged relatives would inherit under the laws of intestate succession. She informed her attorneys that she did not want relatives whom she barely knew, others she did not know, brothers that were of no help to her and sisters who never visited her, to receive any portion of her estate. Decedent not only intended the petitioner to be the sole beneficiary under the will, but also named him as joint tenant on a $4,000 bank account. Decedent never removed petitioner's name from the bank account, nor was there any evidence offered to show that she was dissatisfied with the joint tenancy arrangement.
Decedent never contacted her attorneys regarding any modification to the February 1982 will and never expressed to her attorneys any displeasure with the will's provisions. Her attorneys both testified that she was aware of the effect of the will and that she understood it to be her "last will and testament."
Marchman testified that she read the February 1982 will and that at no time did decedent indicate an intent to change this will. She spoke to decedent in the hospital just prior to her death, and decedent informed her that "everything [was] in order," and that petitioner was aware of her business. We find it significant that decedent never informed Marchman, her close friend and business advisor, of any revocatory intention.
Decedent's next-door neighbor described a loving relationship between decedent and petitioner. She testified that petitioner aided decedent with housework and other chores. Decedent relied on petitioner for transportation, and decedent viewed petitioner as if he were the son she never had. Additional testimony disclosed that decedent *228 characterized petitioner as a "very nice person."
Petitioner visited decedent frequently, both at home and during her many hospital admissions and transported decedent's relatives to and from the hospitals where decedent was admitted. He provided comfort and cheer to decedent's life. Lastly, we note the evidence that many individuals had unrestricted access to decedent's home and that several items of personalty were missing after decedent's death.
While none of the above evidence taken alone would be sufficient to rebut the presumption of revocation, taken together, in its entirety, we believe the evidence sufficiently establishes decedent's continuing unchanged attitude of love and affection toward petitioner and the disposition of the property in her February 4, 1982, will. Given the harmonious relations between decedent and petitioner, supplemented by the evidence that decedent wished to disinherit her relatives, it is unlikely that decedent revoked her will here. See Moos, 414 Ill. 54, 110 N.E.2d 194; Deskins, 128 Ill. App.3d 942, 471 N.E.2d 1018; In re Estate of Babcock (1983), 119 Ill. App.3d 482, 456 N.E.2d 671.
While we are cognizant of the contradicting testimony that decedent intended to change her will and did not want petitioner to "get her property and stuff," it is within the province of the circuit court to determine questions of credibility and the weight to be given evidence, and its findings will not be disturbed unless contrary to the manifest weight of the evidence. (Weir, 120 Ill. App.3d at 21, 458 N.E.2d at 136-37; Netherton, 62 Ill. App.3d at 57, 378 N.E.2d at 802.) We find no basis to substitute our judgment for that of the circuit court.
For the reasons stated, we affirm the order of the circuit court of Cook County admitting decedent's will to probate.
Affirmed.
CAMPBELL and MANNING, JJ., concur.