136 Nev., Advance Opinion 84

# IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| IN THE MATTER OF THE ESTATE OF THEODORE ERNEST SCHEIDE, JR. | No. 76924 |

ST. JUDE CHILDREN'S RESEARCH HOSPITAL,
Appellant,
vs.
THEODORE E. SCHEIDE, III,
Respondent.



FILED

DEC 31 2020

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a district court order denying a petition to admit a lost will in a probate matter. Eighth Judicial District Court, Clark County; Gloria Sturman, Judge.

*Reversed and remanded.*

Hutchison & Steffen, PLLC, and Michael K. Wall and Russel J. Geist, Las Vegas,
for Appellant.

Cary Colt Payne, Chtd., and Cary Colt Payne, Las Vegas,
for Respondent.

BEFORE THE COURT EN BANC.

## OPINION

By the Court, SILVER, J.:

Theodore Scheide, Jr.'s (Theodore) will disinherited his biological son, respondent Theodore Scheide, III (Chip), and left his estate

20-46990

to appellant St. Jude Children's Research Hospital. After Theodore's death, the original will could not be found, and St. Jude petitioned to probate the lost will. NRS 136.240(3) allows the probate of a lost will if it was in existence at the testator's death and at least two credible witnesses prove the will's provisions. A copy of Theodore's executed will existed, and St. Jude provided affidavits of proof of lost will from the attorney who drafted the will and the attorney's assistant. Both witnessed the will's execution, but only the attorney could testify to the will's provisions—the assistant did not read the will when it was drafted. St. Jude also provided evidence to the district court that prior to his death, Theodore repeatedly affirmed he wanted his estate to pass to St. Jude. Chip did not contest the copy's accuracy, instead arguing Theodore revoked the will by destruction and that St. Jude's witnesses did not satisfy NRS 136.240(3). Agreeing with Chip, the district court denied St. Jude's petition, leaving Chip free to inherit the estate, valued at approximately $2.6 million, through intestate succession.

In this opinion, we address whether St. Jude met its burden to show the will was in legal existence and satisfied NRS 136.240(3)'s requirement that two witnesses prove the will's provisions. As to the former, evidence of the testator's unchanged testamentary intent showed the will was in legal existence at the testator's death. As to the latter, an accurate copy of the will existed, the drafting attorney testified to its contents, and the second witness testified to witnessing the will's execution and to her signature on the copy, thereby proving the will's provisions for purposes of the statute. We therefore conclude that under these facts, St. Jude satisfied the requirements of NRS 136.240(3) and the district court erred by denying St. Jude's petition to probate the will.

*FACTS*

In June 2012, Theodore executed a will leaving his estate to his life partner, Velma Shay, or to St. Jude in Tennessee if Velma predeceased him (the June will). St. Jude is a research hospital and nonprofit organization that studies childhood illnesses and provides free medical care to sick children. While alive, Theodore donated substantial sums to St. Jude, and both he and Velma held the hospital in high esteem.

Chip was Theodore's only biological child. The two had been estranged for more than 20 years, and Theodore expressly disinherited Chip and Chip's descendants in the June will. The drafting attorney, Kristen Tyler, and her assistant, notary Diane DeWalt, witnessed the June will's execution and signed as declarants. Theodore requested that Tyler retain the original June will. Four months later, in October 2012, Theodore executed a second will solely to replace the executor (the October will). Tyler and DeWalt again witnessed the will's execution and signed as declarants. Theodore took the executed October will with him.

Velma died in early 2013. Theodore spoke with Tyler several times during 2013 and 2014 and did not mention wishing to reconcile with Chip or revoke his will. To the contrary, Theodore stated he did not want Tyler to locate Chip, reiterating that he wished his estate to pass to St. Jude now that Velma had died.

Kathy Longo, Theodore's stepdaughter from a prior marriage, began assisting Theodore following Velma's death. Longo recalled seeing the will or a copy on a shelf in Theodore's study. Longo did not know Chip and Theodore did not mention Chip to her, although she recalled Theodore mentioning in December 2013 that he was leaving his estate to St. Jude. Theodore began to behave strangely in late 2013 and increasingly struggled to care for himself, even with Longo's help. Theodore's residential lease



expired at the end of November, and Theodore moved into a group home, at which time the majority of his belongings were sold. In December, Longo informed Tyler that she could no longer help care for Theodore and he needed a guardian.

In January 2014, Tyler visited Theodore at the group home and Theodore told Tyler he kept his will with him in a bag or box with other important papers. Susan Hoy from Nevada Guardian Services (NGS) became Theodore's guardian in February 2014 after a physician deemed Theodore unable to care for himself. Thereafter, Hoy moved Theodore into a nursing home and moved his belongings, including his documents, into storage. During that move, Hoy saw a copy of the October will, on which Theodore had written, in blue ink, "OCTOBER 2, 2012" and "UP-DATED" and noted that he was an organ donor. Theodore had also signed the top of that document in blue ink. Hoy later returned the documents to Theodore.

Theodore became increasingly unstable and expressed anger towards everyone involved in his care. He died in August 2014, leaving a multi-million dollar estate. Theodore's facility boxed up the belongings Theodore had kept with him, and Hoy's office retrieved them. Hoy was unable to find Theodore's original October will, although she did find the written-upon copy, which she delivered to the estate's attorney.

The district court appointed Hoy the special administrator of the estate. Hoy opened Theodore's safe deposit box but still did not find the original October will. Hoy speculated to the court that Theodore had destroyed the original will and recommended the estate pass to Chip. Tyler learned of Hoy's recommendation and contacted the estate's attorney and St. Jude. Tyler also filed the original June will that she retained with the court, noting it was substantively identical to the October copy of the will.

Hoy petitioned the court to approve distribution to St. Jude but, after Chip contested Hoy's recommendation, Hoy withdrew it. St. Jude petitioned to probate the lost will.

Both Tyler and DeWalt filed affidavits of proof of lost will, stating that they witnessed Theodore sign the October will and that, to their knowledge, Theodore had not intentionally destroyed or revoked it. Tyler additionally provided that Theodore did not change the beneficiary designations in the October will. Chip, however, submitted a declaration claiming Theodore attempted to reconcile with him before his death.

The court held an evidentiary hearing, at which Tyler, DeWalt, Longo, and Hoy all testified. Tyler testified to the execution of the June and October wills, the accuracy of the copy of the October will, and Theodore's unchanged wish to leave his estate to St. Jude. Tyler also testified that, in early 2014, Theodore affirmatively advised her against contacting Chip. DeWalt, a notary, likewise testified to witnessing the will's execution and, while she could not recall the date of execution, she verified her signature as declarant on the copy of the October will. Longo testified to seeing either the original will or a copy in Theodore's study before he moved into the group home, and testified Theodore told her in December 2013 that he wanted St. Jude to inherit his estate. She also testified Theodore made an annual contribution to St. Jude. Hoy testified she was not aware of Theodore ever discussing his estate planning with anyone at NGS or indicating to them that he wanted to change his will. Hoy maintained she

believed Theodore had destroyed his will, although she admitted this was her own speculation.[1]

The district court denied the petition to admit the lost will. Relevant here, it found the evidence supported that Theodore had lost the will, but also noted Theodore's erratic behavior before he moved into an assisted living facility and found Theodore may have destroyed the will. The district court further found that only Tyler's testimony satisfied NRS 136.240(3)'s two-witness requirement because DeWalt could not recall the will's provisions. And because the district court concluded that two witnesses had not proved the lost will's provisions, it determined St. Jude failed to meet its burden of proof to show Theodore had not revoked the will. The district court therefore denied St. Jude's petition to probate the lost will.

St. Jude appealed and the court of appeals affirmed the petition's denial. *See In re Estate of Scheide*, Docket. No. 76924-COA (Order of Affirmance, Mar. 26, 2020). St. Jude filed a petition for review, which we granted and limited to the issues addressed in this opinion.[2] *See* NRAP 40B(g) (providing this court "may limit the question(s) on review").

---

[1]Hoy testified Theodore once mentioned to an NGS employee that they could find his ex-wife and Chip but, because Hoy was not present for that conversation, she could not provide further details and neither party called that employee to testify.

[2]Chip argues this court should summarily deny the petition for review because St. Jude filed it one day late. Because St. Jude timely filed the petition, albeit with a caption that prevented it from immediately coming to this court, we conclude the petition was timely filed under NRAP 40B(c).

 

## DISCUSSION

This case centers on the interpretation of NRS 136.240(3) (2009),[3] which reads as follows:

> [N]o will may be proved as a lost or destroyed will unless it is proved to have been in existence at the death of the person whose will it is claimed to be, or is shown to have been fraudulently destroyed in the lifetime of that person, nor unless its provisions are clearly and distinctly proved by at least two credible witnesses.

Restated more plainly, this statute prevents probate of a lost will unless (1) the lost will either (a) existed at the time of the testator's death or (b) was fraudulently destroyed, and (2) two credible witnesses clearly and distinctly prove its provisions. In this case, the two issues are whether the will was "in existence at" Theodore's death[4] and whether two witnesses "clearly and distinctly proved" the will's "provisions."[5] *Id.*

*Standard of review*

A court's "primary aim in construing the terms of a testamentary document must be to give effect, to the extent consistent with law and public policy, to the intentions of the testator." *Zirovcic v. Kordic*, 101 Nev. 740, 741, 709 P.2d 1022, 1023 (1985) (quoting *Concannon v.*

---

[3]The statute was amended in October 2017 and again in 2019. Because this case went to trial in June 2017 and the underlying events occurred in 2013-14, we draw from the 2009 statute unless otherwise noted. 2009 Nev. Stat., ch. 358, § 7, at 1624-25.

[4]St. Jude does not contend the will was fraudulently destroyed during Theodore's lifetime, and we do not address that portion of the statute.

[5]We need not address the effect of NRS 136.240(5), which the parties did not raise below and the district court did not address. *See Old Aztec Mine, Inc. v. Brown*, 97 Nev. 49, 52, 623 P.2d 981, 983 (1981) (holding we need not address issues that were not raised below).

 

*Winship*, 94 Nev. 432, 434, 581 P.2d 11, 13 (1978)). NRS 132.010 instructs courts to liberally construe statutes governing wills "so that a speedy settlement of estates is accomplished at the least expense to the parties." Whether the testator revoked a will is a question for the trier fact, *In re Estate of Irvine v. Doyle*, 101 Nev. 698, 703, 710 P.2d 1366, 1369 (1985), and we will not disturb the district court's findings so long as they are supported by substantial evidence, *In re Estate of Bethurem*, 129 Nev. 869, 876, 313 P.3d 237, 242 (2013).

We review questions of law, including statutory interpretation, de novo. *Chandra v. Schulte*, 135 Nev. 499, 501, 454 P.3d 740, 743 (2019). If the statute's language is clear, this court interprets the plain meaning. *Id.* If the statute is ambiguous, this court will consider the legislative intent and public policy in construing the statute. *Id.* A statute may be ambiguous where the language lends itself to two or more reasonable interpretations. *Id.* And "[w]hen the material facts of a case are undisputed, the effects of the application of a legal doctrine to those facts are a question of law that this court reviews de novo." *Am. Sterling Bank v. Johnny Mgmt. LV, Inc.*, 126 Nev. 423, 428, 245 P.3d 535, 538 (2010).

*Whether the will was in existence at Theodore's death*

NRS 136.240(3) states that "no will may be proved as a lost or destroyed will unless it is proved to have been *in existence at the death* of the person whose will it is claimed to be." (Emphasis added.) St. Jude argues the district court properly concluded the will was lost but conflated the issue of whether the will was "in existence" with whether two witnesses could establish the will's provisions; whereas, Chip asserts the will must

have been in actual existence at Theodore's death[6] and contends the evidence supports the will was revoked by destruction.

Under common law, a will that could not be found after the testator's death was presumed revoked by destruction. *Irvine*, 101 Nev. at 703, 710 P.2d at 1369. But we explained in *Irvine* that NRS 136.240(3) only requires the will to be in *legal* existence at the testator's death. *Id.* at 702-03, 710 P.2d at 1368-69. A will is in legal existence if it was validly executed and unrevoked by the testator, even if the will is no longer in physical existence. *Id.*; *see also In re Estate of Cunningham*, 574 S.W.3d 214, 217 n.3 (Ark. Ct. App. 2019) (citing *Irvine* and holding that legal existence does not require physical existence). Thus, despite the common law presumption, a lost will may be probated where the will's proponent can "prove that the testator did not revoke the lost or destroyed will during his lifetime." *Irvine*, 101 Nev. at 703, 710 P.2d at 1369. Because the legal existence element does not provide a burden of proof, we apply a preponderance of the evidence standard. *See Betsinger v. D.R. Horton, Inc.*, 126 Nev. 162, 165, 232 P.3d 433, 435 (2010) (explaining that in the absence of clear legislative intent, "a preponderance of the evidence is all that is needed to resolve a civil matter").

---

[6]Chip relies on *Howard Hughes Medical Institute v. Gavin*, 96 Nev. 905, 621 P.2d 489 (1980). But *Gavin*, which we address further below, dealt with NRS 136.240(3)'s second requirement, the two-witness requirement. *See, e.g., id.* at 907, 621 P.2d at 490 ("[A] will may not be proved as a lost or destroyed will unless it was in existence at the death of the testator *and* unless its provisions can be clearly and distinctly proved by at least two credible witnesses." (emphasis added)).

SUPREME COURT
OF
NEVADA

(O) 1947A

9

We have never squarely addressed how the proponent of a lost will meets its burden of proof to show the will was in legal existence at the testator's death. Other courts addressing this question have concluded that the will's proponent may meet its burden by presenting evidence of the testator's unchanged intent toward the will's disposition. For example, a proponent may rebut the presumption of a lost will's revocation by presenting "evidence indicating an unchanged attitude respecting the disposition in the will. That may be direct evidence, such as declarations of the testator, or circumstantial, from other acts and circumstances which permit an inference of such an unchanged attitude," *In re Estate of Babcock*, 456 N.E.2d 671, 676 (Ill. App. Ct. 1983), such as "that [the testator] entertained a kind and loving attitude toward the proposed beneficiary under the will up to the time of death," *In re Estate of Strong*, 550 N.E.2d 1201, 1206 (Ill. App. Ct. 1990). *See also Williams v. Miles*, 94 N.W. 705, 705 (Neb. 1903) ("[T]his is a presumption of fact only. It may be overcome by evidence, circumstantial or otherwise, to the contrary . . . ."); *In re Estate of Capps*, 154 S.W.3d 242, 245-46 (Tex. Ct. App. 2005) (explaining the presumption of revocation may be overcome by circumstantial evidence); *In re Estate of Wheadon*, 579 P.2d 930, 932 (Utah 1978) (recognizing the presumption of revocation can be overcome by evidence of the testator's attitude toward the beneficiaries or declarations indicating the testator's state of mind regarding the will); *Jackson v. Hewlett*, 77 S.E. 518, 520 (Va. 1913) (concluding that the testator's declarations showed "a continued and unchanged purpose as to the disposition" of his estate, rebutting the presumption of revocation); *In re Auritt's Estate*, 27 P.2d 713, 715 (Wash. 1933) (holding that the presumption of revocation may be rebutted by "evidence as to the testator's attitude of mind and his declarations made

SUPREME COURT
OF
NEVADA

(O) 1947A

between the time of executing the will and the time of his death"); *In re Estate of Richards*, 45 V.I. 287, 289 (2003) (providing that "if the decedent's declarations are consistent with the terms of the lost will, that fact is evidence that the decedent did not revoke his will").[7]

We likewise agree that the proponent of a lost will may show the will was in legal existence at the time of the testator's death by presenting evidence relevant to whether the testator's wishes remain unchanged following execution of the will. This furthers the legislative goal of ensuring the testator's wishes are honored where the evidence supports that the testator did not intend to revoke the lost will. *See* Hearing on S.B. 277 Before the Assembly Judiciary Comm., 75th Leg. (Nev., May 6, 2009) (testimony of Mark Solomon, Chair, Probate & Trusts Leg. Subcomm., explaining an intent to "soften[ ] up the requirements and ma[k]e it easier to prove a lost will when it is obvious that it was not intended to be revoked"); Hearing on S.B. 277 Before the Senate Judiciary Comm., 75th Leg. (Nev., Mar. 24, 2009) (testimony of Mark Solomon, Chair, Probate & Trusts Leg. Subcomm., noting the revisions were "designed to make it easier to prove a lost will where it is obvious that it was not intended to be revoked").

---

[7]Additional relevant evidence may include the access other individuals have to the will, as those individuals, rather than the testator, may have destroyed the will. *See, e.g., Whatley v. Estate of McDougal*, 430 S.W.3d 875 (Ark. Ct. App. 2013) (concluding the circumstances supported rebuttal of the presumption where no evidence showed the testator wished to revoke the will and parties who may have had an interest in destroying the will had access to it); *Strong*, 550 N.E.2d at 1206-07 (addressing whether evidence rebutted the presumption of revocation and noting that many people had access to the testator's home and that some of the testator's personal items were missing after her death).

Here, the district court found the October will was lost and therefore applied the presumption that Theodore destroyed it. We agree with the district court on these initial points. The evidence showed that Theodore kept the original October will in his possession, that at least Longo and Hoy helped move Theodore's belongings after the will was executed, and that Theodore's belongings were sold before he moved into the group home. The record further suggested Theodore opted to keep his important papers on his study shelves and later in a bag or box, rather than in a secure location. Thus, the district court properly concluded the will was lost and, because the original was never found, properly applied the presumption of revocation. *See Irvine*, 101 Nev. at 703, 710 P.2d at 1369.

But the record ultimately supports that the will was in legal existence at Theodore's death. The parties submitted the original June will and a copy of the October will, both of which showed Theodore wished to disinherit Chip and leave his estate to St. Jude. Substantial evidence supported that Theodore's testamentary intent remained unchanged. Theodore made cash contributions to St. Jude during his life, including a substantial contribution during the year before his death and after he executed the 2012 wills. After Velma died, Theodore reiterated several times that he wanted his estate to go to St. Jude. Perhaps most telling, Theodore kept an "UP-DATED" copy of the October 2012 will with him, which he notated and signed on the first page while leaving the beneficiary designation unchanged. Theodore and Chip had long been estranged, and the evidence supporting Chip's claim that Theodore's testamentary

disposition suddenly changed before his death is questionable[8] and contradicted by admissible evidence showing Theodore wished to remain estranged from Chip. And although we acknowledge that testimony established that Theodore came to dislike those involved in his care after a guardian had been appointed, this evidence does not support the district court's decision that Theodore changed the beneficiary of his will in favor of Chip. Finally, while Theodore's erratic behavior in the months immediately before his death provides a theory as to how the will may have gone missing,[9] it does not support that the will was no longer in *legal* existence at Theodore's death.

Accordingly, we conclude the evidence shows the will was in legal existence at the time of Theodore's death. We next consider whether St. Jude satisfied NRS 136.240(3)'s two-witness requirement.

*Whether the witnesses satisfied NRS 136.240(3)*

NRS 136.240(3) states, in addition to requiring that a will be in existence when the testator dies, that "no will may be proved as a lost or destroyed will . . . unless its provisions are clearly and distinctly proved by at least two credible witnesses."

---

[8]Notably, Hoy admitted her belief that Theodore had destroyed the will was speculation. As to Theodore's relationship with Chip, Hoy testified that an NGS employee told her that Theodore suggested the employee find Chip. Even assuming, arguendo, such testimony was not hearsay, *see* NRS 51.035; NRS 51.065; NRS 51.067, this testimony does not show that Theodore wished to change the disposition of his will to support finding revocation.

[9]We note that because Theodore lacked testamentary capacity to revoke his will after guardianship was instituted in February 2014, his erratic behavior during the months before his death does not support that he revoked his will.

St. Jude argues that because Chip does not dispute the contents of the October will and they were sufficiently proved at trial, this statute does not require the witnesses to independently establish the contents of the lost will and the court could consider the collective evidence to determine the will's provisions. And under the facts of this case, St. Jude contends the witnesses met NRS 136.240(3)'s requirement by having personal knowledge of either the will's provisions or its execution. Chip counters that this court has already held that the statute requires two witnesses who can independently testify to the will's contents, citing *Howard Hughes Medical Institute v. Gavin*, 96 Nev. 905, 621 P.2d 489 (1980).[10]

In *Gavin*, the petitioner sought to probate Howard Hughes' lost or destroyed will. *Id.* at 907, 621 P.2d at 490. The petitioner presented "only an unexecuted, unconfirmed draft" of the will, and evidence suggested that Hughes may have drafted at least three other wills thereafter. *Id.* The petitioner attempted to use "declarations made by Hughes" and the statements of "others with personal knowledge of the alleged will" as "substitute[s] for the second credible witness." *Id.* We disagreed that such evidence could establish the will's provisions as required by NRS 136.240(3). *Id.* We explained the testator's statements could not supply one of the credible witnesses and that the statute "require[s] that each of the two witnesses be able to testify from his or her personal knowledge" as to "the contents of the will," calling it a "strict statutory requirement[ ]." *Id.* at 908, 621 P.2d at 490 (and noting that this court rejected a similar argument in *In re Estate of Duffill*, 57 Nev. 224, 61 P.2d 985 (1936)). While

---

[10]Chip does not contest that Tyler and DeWalt properly witnessed and executed the October will.

we still agree with *Gavin*'s outcome, we are cognizant of important factual distinctions between that case and the present appeal that weigh against woodenly applying *Gavin*'s rationale and holding to situations where an authentic copy of the lost will is admitted into evidence.

The two-witness requirement "protect[s] against the probate of spurious wills," *Irvine*, 101 Nev. at 703, 710 P.2d at 1369, and in *Gavin*, substantial concerns existed as to whether the purported lost will represented Hughes' wishes: no evidence showed Hughes ever executed the will; little evidence existed to prove the will's provisions, which the parties hotly contested; and evidence suggested subsequent wills existed, 96 Nev. at 907-09, 621 P.2d at 490-91. No such concerns are present in this case. The copy of the will shows it was executed, the provisions at issue here remain unchanged from the earlier iteration of the will, and the parties do not contest the will's contents.

Other courts addressing similar situations have read the two-witness requirement more fluidly where other evidence in the case exists—such as a photocopy of the executed will—that lessens the necessity for both witnesses to testify to the will's contents, particularly where one witness drafted the will and can testify to the contents. In *In re Moramarco's Estate*, for example, a California appellate court addressed a lost will where the testator intentionally omitted his brother, Frank. 194 P.2d 740, 741-42 (Cal. Dist. Ct. App. 1948). The notary who prepared the will testified as to its provisions, and the notary's wife, who had signed as a witness but had not read the will, testified to her signature on the will. *Id.* at 742. As in NRS 136.240(3), the statute at issue in *Moramarco* required the provisions of the lost will to be "clearly and distinctly proved by at least two credible witnesses." *Id.* at 741-42 (internal quotation marks omitted). The district

court probated a copy of the will over the objection of Frank's children (Frank had died), who argued the testator had revoked the will by destruction and that only one of the two witnesses could testify to its contents. *Id.* The appellate court rejected that argument, explaining that while proof of the contents from two witnesses would be "an indispensable requirement" where that testimony was the only evidence to establish the will's contents, the need for both witnesses to recall the contents lessened where a copy existed and the witnesses could identify it as a duplicate of the original will. *Id.* at 743. Thus, "[i]f it was proved to be a true copy, the terms of the will were thereby established," and under such circumstances, the will's proponent could meet the statute's requirements if the credible witnesses clearly and distinctly proved "the identity of the copy." *Id.*

We recognize that *Moramarco* is not without opposition,[11] and that historically the two-witness requirement has been construed as requiring both witnesses to have independent knowledge of the will's contents. *See* 54 Am. Jur. 3d *Proof of Facts* § 239 (1999) ("It is generally held that to be a credible witness, the witness must have independent

---

[11]*See In re Estate of Ruben*, 36 Cal. Rptr. 752, 759 (Dist. Ct. App. 1964) (questioning *Moramarco*'s validity in light of the statutory language); *see also In re Estate of Lopes*, 199 Cal. Rptr. 425, 428 n.7 (Ct. App. 1984) (calling the two-witness requirement "unsettled" when a copy of the will is available). *Ruben*, however, represents an outdated distrust toward copy machines that is implicitly rejected in NRS Chapter 136. *Compare Ruben*, 36 Cal. Rptr. at 760 (voicing concerns that "the ubiquitous duplicating machine" with "its sophisticated process" could "be used improperly" to replace the witnesses), *with* NRS 136.240(5)(b) (providing that if the will's proponent makes a prima facie showing the will was not revoked by the testator, then, in the absence of any objection, the court must accept a copy as proof of the will's terms).

knowledge of the contents, and an authenticated copy may not be used as a substitute for one of the required witnesses unless permitted by statute."). Yet it is equally established that exceptions to the two-witness requirement exist. *See* 95 C.J.S. *Wills* § 678 (2011) (recognizing an exception that "allow[s] proof by a correct copy of the will and the testimony of one witness");[12] A.M. Swarthout, Annotation, *Proof of contents in establishment of lost will*, 126 A.L.R. Ann. 1139, 1148 (IV)(c)(1) (1940) ("Although there is little express authority on the point, there seems to be no doubt that a properly identified copy of an alleged lost will is admissible in evidence to prove the contents thereof . . . ."). Moreover, some jurisdictions allow a copy to provide the will's contents where a witness can testify to the authenticity of the copy. *See* Ariz. Rev. Stat. Ann. § 14-3415 (2012) ("If a will is found to be valid and unrevoked and the original will is not available, its contents can be proved by a copy of the will and the testimony of at least one credible witness that the copy is a true copy of the original."); Wash. Rev. Code Ann. § 11.20.070 (1998) ("The provisions of a lost or destroyed will must be proved by clear, cogent, and convincing evidence, consisting at least in part of a witness to either its contents or the authenticity of a copy of the will."); *cf.* N.Y. Sur. Ct. Proc. Act Law § 1407 (McKinney 1995) ("A lost or destroyed will may be admitted to probate only if . . . [a]ll of the provisions of the will

---

[12]Consistent with the recognized exception, Arkansas allows a correct copy to stand in for one witness. *See, e.g.*, Ark. Code Ann. § 28-40-302 (1987) ("No will of any testator shall be allowed to be proved as a lost or destroyed will unless: (1) The provisions are clearly and distinctly proved by at least two (2) witnesses, a correct copy or draft being deemed equivalent to one (1) witness . . . .").

Supreme Court
of
Nevada

(O) 1947A

are clearly and distinctly proved by each of at least two credible witnesses or by a copy or draft of the will proved to be true and complete.").

Pennsylvania addressed what witnesses must do to prove a will and recognized that both witnesses need not prove a lost will's contents when a duly executed copy exists. *In re Estate of Wilner*, 142 A.3d 796 (Pa. 2016).[13] In that case, the testator Isabel Wilner left her estate to her church. *Id.* at 798. The drafting attorney and a legal secretary witnessed the will's execution. *Id.* The attorney kept a copy and gave the original to Wilner, who instructed her live-in caretaker to place the original in an unlocked metal box and put a copy in a safe. *Id.* Wilner's niece unexpectedly visited and pressured Wilner to move into a nursing home and to give the niece "certain family documents." *Id.* Shortly after Wilner died, her caretaker realized the will and copy were missing. *Id.* at 799. Yet Wilner never mentioned revoking the will to her caretaker or her attorney, who she continued to talk to regularly. *Id.* The district court admitted the copy to probate over the niece's objection after concluding the evidence rebutted the presumption of revocation. *Id.* at 799-800.

In the later appeal, the Pennsylvania Supreme Court concluded the witnesses must prove the validity of the signatures on the documents and prove that the will was a valid testamentary instrument. *Id.* at 802-03. In determining that both witnesses were not required to testify to the will's contents, the court observed that "in many cases it will be unlikely

---

[13]*Wilner* addressed 20 Pa. Cons. Stat. Ann. § 3132 (1975), which provides that "[a]ll wills shall be proved by the oaths or affirmations of two competent witnesses." *See generally* 142 A.3d at 802-06. Although that statute does not expressly require the witnesses to prove the will's contents, the court nevertheless addressed why such proof would be unnecessary when a copy of the will was available. *Id.*

that anyone besides the testator and the drafting attorney is aware of the contents of the will" and that "it is unlikely that a disinterested witness—such as an attorney's secretary or paralegal—would be able to recall the document's contents in any event given the amount of time which may pass between execution and death and the large number of wills such persons may witness over time." *Id.* at 803. The court explained that under circumstances such as those present in *Wilner*, where a copy of the will existed, "there is no need for such knowledge by the witnesses for them to fulfill their role in confirming the validity of the testator's signature." *Id.*

We find the reasoning in *Wilner* and *Moramarco* persuasive. We recognize the plain language of NRS 136.240(3) requires the will's provisions be "clearly and distinctly proved by at least two credible witnesses." It follows that in situations where no copy of the will exists and the only proof of the will's contents comes from witness testimony, the two witnesses must each have personal knowledge of the will's contents. *See Gavin*, 96 Nev. at 908, 621 P.2d at 490.[14] However, construing NRS 136.240(3)'s two-witness requirement as necessarily requiring both witnesses to testify to the will's contents in cases where an accurate copy of the will exists and the drafting attorney can testify to the contents would create an absurd result of putting an unnecessary and onerous burden on the second witness and the petitioner. *See State, Private Investigator's Licensing Bd. v. Tatalovich*, 129 Nev. 588, 590, 309 P.3d 43, 44 (2013)

---

[14]Again, we note the facts surrounding the lost will in *Gavin* differ significantly from the lost will in the present case. Notably, in *Gavin*, there was no copy of an executed will, there was evidence of at least three other subsequent wills, and the petitioner sought to use the testator's declarations and statements from the testator's deceased attorneys to establish the will's contents. 96 Nev. at 907, 621 P.2d at 490.

(noting we avoid interpretations that would lead to absurd results). When an accurate copy of the will is available, a more liberal construction comports with NRS 132.010 and the legislative history discussed above demonstrating that the revisions to the lost wills statute were "designed to make it easier to prove a lost will where it is obvious it was not intended to be revoked." Hearing on S.B. 277 Before the Senate Judiciary Comm., 75th Leg. (Nev., Mar. 24, 2009) (testimony of Mark Solomon, Chair, Probate & Trusts Leg. Subcomm.).

As pertinent here, we conclude that where an accurate copy of the will exists and one of the witnesses can testify to the contents, the second witness may satisfy NRS 136.240(3)'s two-witness requirement by testifying to the testator's signature on the copy. The second witness's testimony that the copy contains a fair and accurate depiction of the testator's signature on the original will, combined circumstantially with the testimony of the other witness and the existence of an accurate copy, confirms the witness was present when the testator executed the will and proves the second witness's knowledge of that will. This in turn authenticates the document and proves the will's provisions for purposes of the statute.

Here, Chip does not contest the will's contents or argue the copy is inaccurate, and the record demonstrates the following: Hoy produced a copy of the October 2012 will, and Theodore's estate attorney, Tyler, produced the original June 2012 will, which is identical in substance to the October will. Tyler also testified to the will's contents. This evidence proves the October will's contents. The district court found that Tyler had a "distinct recollection of the terms of" the October will and provided testimony sufficient to satisfy NRS 136.240(3), and the record supports this

SUPREME COURT
OF
NEVADA

(O) 1947A

finding. The second witness, DeWalt, provided an affidavit stating she had witnessed the will's execution by Theodore and signed the will, and at the trial she affirmed her signature on the copy and testified to the will's execution.[15] Based on the foregoing, we conclude that Tyler and DeWalt satisfied NRS 136.240(3)'s two-witness requirement in proving the will's provisions and the district court erred by concluding St. Jude failed to meet the statutory requirements to prove the lost will.

## CONCLUSION

NRS 136.240(3) allows a lost will to be probated where the will was in legal existence at the time of the testator's death and at least two credible witnesses clearly and distinctly prove the will's provisions. Here, the evidence adduced at trial showed the testator's disposition toward the will's beneficiary remained unchanged, supporting that it was in legal existence at the testator's death. An accurate copy of the will existed. The drafting attorney testified to the contents of the will and provided an affidavit stating that she signed the will and that the testator signed and executed the will. The attorney's assistant, who acted as the second declarant, likewise provided an affidavit stating she was present at the will's execution, signed the will, and watched the testator sign the will, and at trial she testified to witnessing the will's execution and to her signature on the copy. Under these facts, NRS 136.240(3)'s two-witness requirement

---

[15]Although at trial DeWalt could not recall the date on which she witnessed the will's execution, she verified her signature on the October will, thereby ultimately authenticating that copy. Moreover, her failure to recall the date does not create a credibility problem where she witnessed both the June and October wills and signed both as a declarant, and the provisions at issue here are identical in both wills.

was satisfied.  We therefore reverse and remand with instructions for the district court to probate the lost will.

                                            _____, J.
                                            Silver

We concur:

_____, C.J.
Pickering

_____, J.
Gibbons

_____, J.
Hardesty

_____, J.
Parraguirre

_____, J.
Stiglich

_____, J.
Cadish

SUPREME COURT
OF
NEVADA

(O) 1947A